**In re Martha R. KAVE,
Petitioner, Appellant.**

No. 84–1859.

United States Court of Appeals,
First Circuit.

Heard Dec. 7, 1984.

Decided March 29, 1985.

As Amended June 20, 1985.

Roger Brunelle, Worcester, Mass. with whom Richard T. Tucker, and Weinstein, Bernstein & Burwick, P.C., Worcester, Mass., were on brief for petitioner, appellant.

Joseph F. Frankl, Atty., Washington, D.C., with whom Rosemary M. Collyer, General Counsel, John E. Higgins, Deputy General Counsel, Harold J. Datz, Associate General Counsel, Joseph E. Mayer, Asst. General Counsel, and John W. Hornbeck, Deputy Asst. General Counsel, Washington, D.C., were on brief for N.L.R.B.

Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

This case is before us on appeal from an order adjudging appellant in civil contempt for failure to answer questions and produce documents before a special master named to determine whether an employer violated prior orders of the district court. The principal questions raised are related to the distinction between civil and criminal contempt. Also of concern are allegations that put into contention the fifth amendment privilege against self-incrimination.[1] A detailed statement of the factual background is required before we can decide the legal issues raised thereby, which are recurring problems before trial courts.

As a result of a petition filed by the National Labor Relations Board (the Board),[2] the district court issued an injunc-

---

1. Although there are other issues raised by this appeal, including matters related to the attorney-client privilege and the work-product doctrine, in view of our disposition of this case, we need not concern ourselves with them.

2. Pursuant to Section 10(j) of the National Labor Relations Act (29 U.S.C. § 160(j)) (the Act) the Board may, upon the issuance of a complaint, seek ancillary injunctive relief from the appropriate district court in aid of its jurisdic-

tion on November 19, 1982 ordering the employer, Workroom for Designers, Inc. (Workroom), to cease and desist from engaging in numerous acts alleged to be unfair labor practices and further affirmatively requiring Workroom to recognize and bargain with the International Ladies Garment Workers Union, AFL–CIO (the Union), and to offer reinstatement to certain striking employees upon their offer to return to work. The order was directed to Workroom and "its officers, representatives, agents, servants, employees, attorneys, successors and all members and persons acting in concert or participation with it or them."

Thereafter, in May, 1983, the Board filed a petition with the district court seeking an adjudication in civil contempt and requesting the institution of criminal contempt proceedings against Workroom and additional respondents, namely Workroom's president, Sidney Sisselman (Sisselman), and his son Brian. On September 6, 1983, appellant Martha Kave (Kave) was retained by Workroom and Sisselman to represent them in this matter, and on September 13th she entered an appearance on their behalf. Shortly thereafter, during the course of the hearing on the Board's petition for adjudication of civil contempt,[3] a consent decree was entered into on September 16, 1983.

In the decree it was agreed that Workroom and Sisselman would: (1) comply with the November 19, 1982 injunction order; (2) pay into Court $200,000, to be paid in monthly installments through September, 1984;[4] (3) put all willing employees back to work within 30 days; (4) enter into a collective bargaining agreement with the Union within 60 days; and (5) make "every bona fide effort" to retrieve work and obtain new contracts. This decree was made applicable to Workroom, "its officers, agents, successors and assigns," and to Sisselman.

On February 7, 1984, Kave filed a motion for leave to withdraw as counsel for Workroom and Sisselman, stating as grounds certain actions by Sisselman that she considered damaging to her professional reputation,[5] and also the fact that there was an outstanding account for her services. Kave's motion was allowed by the district court.

Thereafter, on April 3, 1984, as a result of a joint motion of the Board and the Union in which it was claimed that Sisselman was violating the September, 1983 consent decree,[6] the district court named a special master, with receivership duties and with power to act "to the full extent permissible" under Fed.R.Civ.P. 53.[7] The spe-

---

tion to prevent unfair labor practices, and to maintain the status quo pending the completion of its regular procedures. *Compton v. National Maritime Union,* 533 F.2d 1270 (1st Cir.1976).

3. The criminal contempt request having been withdrawn.

4. It is not clear on the record whether this sum is by way of a fine, or as a back pay fund, or for other purposes.

5. Namely several ex parte written communications by Sisselman to the district judge between September 13, 1983 and February 1, 1984.

6. By operating a run away shop, by failing to solicit business for Workroom, by failing to reinstate the employees named in the order of November 1982, and by failing to pay the stipulated amounts into the district court fund.

7. Rule 53. Masters

 . . . . .

 (c) Powers. The order of reference to the master may specify or limit his powers and

may direct him to report only upon particular issues or to do or perform particular acts or to receive and report evidence only and may fix the time and place for beginning and closing the hearings and for the filing of the master's report. Subject to the specifications and limitations stated in the order, the master has and shall exercise the power to regulate all proceedings in every hearing before him and to do all acts and take all measures necessary or proper for the efficient performance of his duties under the order. He may require the production before him of evidence upon all matters embraced in the reference, including the production of all books, papers, vouchers, documents, and writings applicable thereto. He may rule upon the admissibility of evidence unless otherwise directed by the order of reference and has the authority to put witnesses on oath and may himself examine them and may call the parties to the action and examine them upon oath. When a party so requests, the master shall make a record of the evidence offered and excluded in the same manner and subject to the same

cial master's reference required that he render a report in which he set forth his findings of fact and recommendations on the following issues:

(a) Whether this Court should hold respondents Sisselman and Workroom for Designers, Inc., their agents, employees, successors and assigns, or any persons acting in concert and participation with either or both, in civil contempt of the Order of this Court of November 19, 1982, as amended December 3, 1982, the Consent Decree issued September 29, 1983, and the Order of Reference issued this date.

(b) Whether this matter should be referred to the United States Attorney as to whether criminal contempt shall issue against respondents Sisselman and Workroom for Designers, Inc., or any agents, employees, successors, assigns, or persons acting in concert and participation with either or both.

The special master commenced his inquiry, as part of which a subpoena was issued by the court and served upon Kave commanding her to appear before the master and produce a series of documents,[8] some of which directly related to Workroom, Sisselman, or close relatives of Sisselman. Kave, through counsel, attempted to quash the subpoena, principally on attorney-client and work-product privilege grounds, but the court ruled that the matter should be raised in the first instance before the master. At an initial hearing held on August 22, 1984, Kave's lawyer indicated to the master that "[t]here are

other grounds for declining to produce the documents which we can go into now or if you want to do it at the resumption of the formal hearings. I'll leave that to you."

The formal hearings resumed on August 27th, Kave having been served with a subpoena identical to that served earlier and considered at the August 22th hearing. Her motion to quash was denied by the master, who ruled regarding the attorney-client issue that:

Inasmuch as the evidence demonstrates that Ms. Kave represented Mr. Sisselman in the contempt proceedings and assisted in the settlement of the action in September, 1983 (and, in any event, the Court could take judicial notice of that fact), there has been a *prima facie* showing that Mr. Sisselman sought or utilized Ms. Kave's advice and assistance in order to further a fraud upon the Court.

On the basis of this finding the master concluded that Kave's communications with Sisselman came within the "crime-fraud" exception to the attorney-client privilege. *See Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933) ("The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law"). He ruled, therefore, that the documents and Kave's related testimony were not privileged.

Kave was then questioned by the master. After identifying herself and indicating her

---

limitations as provided in the Federal Rules of Evidence for a court sitting without a jury. (d) Proceedings.

 (2) Witnesses. The parties may procure the attendance of witnesses before the master by the issuance and service of subpoenas as provided in Rule 45. If without adequate excuse a witness fails to appear or give evidence, he may be punished as for a contempt and be subject to the consequences, penalties, and remedies provided in Rules 37 and 45.

**8.** The subpoena sought: "All bookkeeping records, receipts, correspondence, notes, memo-

randa, case files, time sheets, telephone records, corporate or personal Federal tax returns to, for or concerning:

a) Sidney H. Sisselman and/or Simone Sisselman
b) Fred Rosen
c) Workroom for Designers, Inc.
d) Kittery Point Corporation
e) Kittery Point Company
f) Kittery Point Garment Company
g) Commercial Contracting Company
h) The Bag Guys, Inc.
i) Michele Sisselman
j) Brian Sisselman."

occupation she declined to answer any further questions put to her, claiming either attorney-client privilege, on which issue the master again ruled against her, or, after said rulings, the fifth amendment privilege, which also was rejected.[9] Kave, through counsel, also asserted a fifth amendment privilege with respect to the subpoenaed documents, contending that any acknowledgment of their existence or non-existence might in itself tend to incriminate her.

On September 28, 1984, the master filed a comprehensive report and recommendation in which he made detailed findings and rulings with respect to Kave's allegations of privilege. Regarding the attorney-client privilege, he determined that the communications relating to the settlement of the contempt action in the district court fell within the purview of the crime-fraud exception to that privilege. He further held that the privilege did not apply to the examination of Kave regarding the fact of representation and identity of various clients. *Cf. United States v. Strahl*, 590 F.2d 10, 12 (1st Cir.1978), *cert. denied*, 440 U.S. 918, 99 S.Ct. 1237, 59 L.Ed.2d 468 (1979).

As to Kave's claim to protection against self-incrimination, the master held that "it was perfectly clear, in light of the circumstances, that her answer to the questions as framed could not possibly have had the tendency to incriminate her." Central to this holding, at least by implication, was the master's perception to the effect that most of the information sought through the interrogation was already a matter of public record.[10] Thus in effect the master was saying that Kave could not possibly incriminate herself further than she already had by other acts.

Regarding Kave's fifth amendment response to the production of documents, the master concluded that said protection was not at issue because testimonial communication was not involved, *see Fisher v. United States*, 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39 (1976); *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), even with respect to documents that could have been authored by Kave herself. The master ruled that the documents did not come within the First Circuit's exception of "personal self-created business records in the possession of a sole proprietor or practitioner," *see In re Grand Jury Proceedings (Martinez)*, 626 F.2d 1051, 1056 (1st Cir.1980), because Kave had failed to meet the burden of demonstrating her entitlement to the exception. *See Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *United States v. Doe*, 628 F.2d 694 (1st Cir.1980). The master thus concluded that Kave's actions were "unjustified and without excuse ... and were contemptuous of [the] Court." He recommended the issuance of an order to show cause, and upon a finding of merit by the court, that various actions be taken by Kave,[11] including, as more pertinent to the principal issues before us, that:

She be assessed as a compensatory penalty the sum of $3,000.00 to be paid into the Court for reimbursement of stenographer costs and master's and attorneys' fees for the largely useless August 17, August 22 and August 27, 1984 ses-

---

**9.** Typical of the questions asked of her, and the resulting colloquies, is the following:

Q. ... Since the fall of 1983, have you represented Sidney Sisselman in any legal matters?

A. I am saying that that's subject to attorney-client privilege.

THE MASTER: Are you declining to answer the question?

THE WITNESS: Yes, I am.

THE MASTER: I make the, I make the ruling that the fact [of] representation, whether you represented somebody or not, the identity of your client is not a matter which is subject to attorney-client privilege, and I direct you to answer the question.

THE WITNESS: I am going to have to claim the Fifth Amendment privilege.

THE MASTER: The Fifth Amendment privilege?

THE WITNESS: Yes.

**10.** For example, the master noted that Kave had been counsel of record to Workroom and Sisselman.

**11.** Namely that she surrender the subpoenaed documents.

sions of the master's hearings, for any show cause hearing before the Court and for preparation of this report.

Based upon this report, the district court ordered Kave to appear before it and show cause why she should not be held in contempt for refusing to answer questions and to comply with the subpoena. The order was thereafter amended to require Kave to bring to the hearing the documents sought in the subpoena.

The hearing before the district court was held on October 19, 1984. At the hearing Kave, through counsel, presented oral arguments as well as an extensive written memorandum substantiating the legal reasons for her refusal to testify or produce the documents. These are in essence the same issues being raised on appeal: that the proceedings against her, although purportedly civil in nature, were *de facto* criminal notwithstanding the failure to comply with the due process requirements for criminal contempt; that the refusal to answer or produce before the master could not be the basis, without more, for a civil contempt finding by the district court as such refusal did not constitute a violation of 28 U.S.C. § 1826; and that, in any event, the refusals were justified on attorney-client privilege or fifth amendment grounds. Kave also filed a written motion offering to testify in a limited manner concerning certain of the areas of inquiry by the master, and subject, in some instances, to a ruling by the district court that so testifying would not constitute waiver of her fifth amendment privileges.[12]

After hearing argument from Kave's counsel and considering the memorandum and motions in opposition to the master's report, the district court issued its ruling from the bench, affirming the master's rulings in all respects, except as to Fred Rosen. The court accepted the master's ruling denying Kave's motion to quash the subpoena duces tecum on grounds of overbreadth, relevancy, and attorney-client privilege. On the issue of Kave's fifth amendment claim, the court ruled that Kave had asserted the privilege belatedly, and that the existence of documents related to her representation of Workroom, Sisselman and his family members, and Commercial Contracting Company could not possibly tend to incriminate her, and that Kave failed to meet her burden of demonstrating her entitlement to claim a fifth amendment privilege with regard to the production of documents related to her representation of Kittery Point Company and Fred Rosen.[13] The district court thus found Kave's fifth amendment claim to be without merit, and characterized Kave's conduct as bespeaking "a complete refusal to cooperate with the judicial proceedings being conducted by the special master."

In purgation of these contumacies, the district court ordered Kave to: (1) surrender to the master the documents within her control pertaining to the contempt petition, the negotiations that culminated in the settlement of the contempt proceedings, and

12. The substance of Kave's offer of proof was: (1) that she never represented or had records of Fred Rosen, Kittery Point Corporation, Kittery Point Company, Kittery Point Garment Company, Commercial Contracting Co., or the Bag Guys, Inc.; (2) that she held no records belonging to any of the Sisselmans or to Workroom, which she held in a representative capacity subject to any such persons having a right to demand their return; (3) that subject to the Court ruling that such testimony did not constitute a fifth amendment waiver, she would testify: (a) as to whether she represented the Sisselmans or Workroom during the period of the alleged fraudulent scheme, (b) to sufficient facts to establish her claim of attorney-client privilege regarding communications between herself and the Sisselmans and Workroom, outside the peri-od of the alleged fraudulent scheme, and (c) to sufficient facts to establish her independent attorney work product privilege as to documents relating to labor cases handled for the Sisselmans and Workroom during the period of the alleged fraudulent scheme; and (4) that subject to the court ruling that she would not waive her fifth amendment privilege, she would produce documents related to the Sisselmans or Workroom for any time outside the period during which it was claimed the fraudulent scheme took place.

13. It would appear that this ruling is in conflict with the court's earlier ruling regarding Rosen, but the record offers no explanation for this apparent inconsistency.

the entry of the consent decree; [14] (2) surrender to the receiver, upon his request, all documents related to or generated in connection with her representation of Workroom, Kittery Point Corporation, or any other business activity of Sisselman; (3) respond to the questions asked her at the August 27th hearing; and (4) pay to the court, by October 26th, $3,000.00 for reimbursement of stenographer costs and master's and attorneys' fees incurred in connection with the hearings of August 17th, 22nd and 27th and October 19th.

Kave appeals from the district court's order, which has been stayed by this court pending the outcome of this matter.

*The nature of the alleged contempt and its consequences.*

The starting point for any review of the actions of the district court commences with a determination as to the nature of the contempt alleged. This, of course, is a crucial inquiry because the rights of a contemnor vary considerably depending on whether the proceeding is civil or criminal in nature.

■ An alleged criminal contemnor is entitled to notice that he is criminally charged. *See* Fed.R.Crim.P. 42(b); *Flight Engineers Int'l Ass'n v. Eastern Air Lines, Inc.,* 301 F.2d 756 (5th Cir.1962). Such a contemnor is also protected by a presumption of innocence that can only be overcome by proof beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *United States v. Spectro Foods Corp.,* 544 F.2d 1175, 1183 (3d Cir.1976). Furthermore, as in the case of any criminal defendant, the right to trial by a petit jury may attach. *Muñiz v. Hoffman,* 422 U.S. 454, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975); *United States v. Professional Air Traffic Controllers Org.,* 678 F.2d 1 (1st Cir.1982).

■ In deciding whether a proceeding before a lower court refers to civil or criminal contempt, the appellate court is required to look to the purpose and character

of the sanctions imposed, rather than to the label given to the proceeding by the court below. *Latrobe Steel Co. v. United Steelworkers of America,* 545 F.2d 1336, 1342–43 (3d Cir.1976).

■ The purpose of a criminal contempt proceeding is the vindication of the court's authority by *punishing for a past violation* of a court order. *United States v. United Mine Workers,* 330 U.S. 258, 302, 67 S.Ct. 677, 700, 91 L.Ed. 884 (1947); *United States v. Professional Air Traffic Controllers Org., supra; G. & C. Merriam Co. v. Webster Dictionary Co.,* 639 F.2d 29, 40 (1st Cir.1980). In contrast, civil contempt is imposed to *coerce present or future compliance* with an order of the court. *United States v. United Mine Workers, supra; United States v. Professional Air Traffic Controllers Org., supra.*

■ The sanctions of imprisonment and monetary fines are available in both civil and criminal contempt proceedings. However, the imprisonment and/or fine imposed in a criminal contempt proceeding is the culmination of a typical criminal trial in which the contemnor is *punished* by way of a sentence. In contrast, a civil contempt judgment results in imprisonment or a conditional fine to *induce* the purging of contemptuous conduct. *United States v. Professional Air Traffic Controllers Org., supra.* Additionally, in a civil contempt the court can impose a *compensatory* fine to make whole the aggrieved party for damages caused by the contemnor's conduct. In this case, any amount assessed by the court must be based upon *evidence* of the complainant's *actual* losses, and his right to recover, as in any civil litigation, is dependent upon the outcome of the underlying controversy. *United States v. United Mine Workers, supra,* 330 U.S. at 304, 67 S.Ct. at 701; *United States v. Professional Air Traffic Controllers Org., supra.*

■ If monetary assessment of a specific amount is neither compensatory nor

---

**14.** The order also set forth provisions by which Kave could, in subsequent proceedings, preserve her claims of attorney-client and fifth amendment privilege.

**352**

conditioned on the occurrence of future violation of court orders, it raises a presumption that the fine is punitive in nature. Such a fine cannot be imposed as part of a civil proceeding in which the alleged contemnor's due process rights have not been observed. *United States v. Professional Air Traffic Controllers Org., supra.*

 On the record before us, the fine imposed upon Kave cannot be sustained as being coercive. The three thousand dollar fine was not made prospectively contingent on Kave's continuing refusal to comply with the court's order to testify or produce documents, but rather was flat and unconditional. Kave was not given the opportunity to avoid the fine imposed by purging herself. In fact, at the hearing before the district court, Kave made an offer to testify which the court rejected.[15] Furthermore, later developments show at least some attempt by Kave to reform her allegedly contemptuous conduct.[16] The fine imposed is thus clearly not intended to coerce Kave into present or future compliance with orders of the district court, but rather appears to punish her for past deeds.

If, as appears to be intended,[17] the purpose of the fine was to reimburse for expenses or losses incurred, then as implemented, this action is contrary to established civil contempt doctrine. To begin with, the complaining party is the Board, yet the fine is payable to the *court.* This is inconsistent with the general rule that a punitive fine is paid into the coffers of a court and a civil fine is paid to the aggrieved party to compensate for its losses. Additionally, recovery of the fine imposed in this case is not conditioned upon the Board's ultimate success in the underlying dispute.[18] Rather, it appears to be an unconditional fine, to be paid by Kave irrespective of the outcome of that controversy. Lastly, and equally important, there is no evidence to support the amount assessed by the district court. There is no substantiating documentation or testimony upon which we can conclude that the fine represents *reasonable compensation for losses* incurred by the victim of the alleged contemnor's conduct. *Cf. Allied Materials Corp. v. Superior Products Co.,* 620 F.2d 224, 227 (10th Cir.1980); *Lichtenstein v.*

15. The following colloquy developed during the October 19th show-cause hearing:

MR. BRUNELLE [Kave's counsel]:

. . . . .

What I am saying, your Honor, I don't think she can be punished now she indicates a willingness to testify, I don't think the fact that she balked at testifying before, I don't think she can be punished. That is the only point I'm trying to make.
THE COURT: That's up to the Court. She can purge herself but the Court can punish her.
MR. BRUNELLE: I don't think you can unless you're going to—well, it's a good point. I don't think this is a criminal contempt proceeding.
THE COURT: It's a civil contempt.
MR. BRUNELLE: The witness is always given the opportunity to purge himself. What you're suggesting is she be punished irrespective of whether she has a willingness to testify.
THE COURT: There are various many ways of punishement. (sic) You're indicating, as I understand you, incarceration, there are other ways other than incarceration.

16. During oral argument before this court the parties indicated that at least partial compliance

was effectuated by Kave after the October 19th hearing. A stipulation filed with this court indicates that on or about November 28, 1984, at the petition of the United States upon the request of the Board, the district court granted Kave immunity pursuant to 18 U.S.C. § 6001 *et seq.* The stipulation also states that Kave, on December 6, 1984 in response to a subpoena duces tecum similar in content to the one here at issue, "appeared before the special master bringing with her certain documents," which she identified and produced, and "testified that these were all of the documents in her possession and control that where responsive to the subpoena."

17. As previously indicated, the district court's bench ruling was that the fine was "to be paid into the Court within seven days for reimbursement of stenographer costs and Master's and attorney's fees incurred in connection with the hearings of August 17th, August 22nd and 27th.... The amount shall also be used to defray the cost incurred by the Special Master in preparation of his report and recommendation, and the cost of this show-cause hearing."

18. The underlying dispute for these purposes is the Board-Kave dispute, not the various other disputes to which the Board-Kave litigation is in large part ancillary.

*Lichtenstein,* 425 F.2d 1111, 1114 (3d Cir.1970).

We are thus forced to conclude that the fine imposed does not meet the requisites of a valid civil contempt fine, either as a coercive or compensatory measure.

 In view of the intended nature of the district court's actions, it might be appropriate to remand this case to allow said court to reconsider its decision, and perhaps to conduct additional proceedings for the purpose of making supplementary findings.[19] However, the substantive aspects of the master's interrogation of Kave, and the nature of the defenses raised thereto, require a different outcome. We cannot avoid deciding the merits of Kave's substantive arguments by a remand on the fine issue, because, in the final analysis, even a properly imposed civil fine will fall before valid privilege allegations. We must, therefore, consider these claims.[20]

*The fifth amendment privilege against self-incrimination.*[21]

 The next question presented is whether Kave had a fifth amendment privilege in connection with the master's inquiry.[22] This in turn must be separately addressed as related to the oral examination, and as to the production of documents.

 The privilege against self-incrimination is one of the most important constitutional principles inherited from the common law. *See Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). It derives from the common law's *nemo tenetur seipsum accusore* and was aimed at preventing the recurrence of Star Chamberlike proceedings, it being deemed that avoiding that greater evil was more crucial than the occasional lesser harm that could result from a guilty person going unpunished. *See Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *Ullmann v. United States,* 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 *reh'g denied,* 351 U.S. 928, 76 S.Ct. 777, 100 L.Ed. 1457 (1956). A measure of its importance is the fact that even the existence of a state of war cannot suspend or change its vitality. *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921). As previously indicated, although the Constitution couches this privilege in terms of criminal cases, it is now beyond question that the right of a witness[23] not

---

**19.** *Cf. NLRB v. Local 254, Building Service Employer,* 376 F.2d 131, 136 (1st Cir.), *cert. denied,* 389 U.S. 856, 88 S.Ct. 86, 19 L.Ed.2d 123 (1967).

**20.** As previously indicated (*see supra* note 1), only the fifth amendment issue need be entertained. The actions of the parties while this case was on appeal (*see supra* note 16), or the setting aside of the fine, does not render the issues raised on appeal moot, considering the possible criminal and disciplinary matters that may result from the various actions in dispute. *See Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969) ("a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome"); *Main Line Fed. Svgs. and Loan Ass'n v. Tri-Kell, Inc.,* 721 F.2d 904, 907 (3d Cir.1983) ("determination that a case is moot requires that there be nothing gained by reaching a decision").

**21.** "No person ... shall be compelled in any criminal case to be a witness against himself, ...." U.S. Const. amend. V.

**22.** Appellees also argued that Kave delayed too long before claiming that production of the subpoenaed documents would violate her fifth amendment privilege against self-incrimination. While the preferable course would have been for Kave to have raised the fifth amendment argument in the motion to quash, Kave did raise the matter at the hearing before the master (albeit after the motion to quash had been denied) at a time when the master could have easily reconsidered his ruling without occasioning undue delay.

**23.** The right of an *accused* not to take the stand in a criminal case, and the right of a *witness* not to give incriminating answers, although both within the fifth amendment's scope, are to be distinguished. *See DeLuna v. United States,* 308

to give incriminating answers applies with equal force to any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory, whenever the answer to a question put to a witness might tend to subject him to criminal responsibility. *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 *reh'g denied*, 408 U.S. 931, 92 S.Ct. 2478, 33 L.Ed.2d 345 (1972); *United States v. United States Coin & Currency*, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971); *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); *McCarthy v. Arndstein*, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924). *See generally* Daskel, *Assertion of the Constitutional Privilege Against Self-Incrimination in Federal Civil Litigation: Rights and Remedies*, 64 Marq.L.Rev. 243 (1980). This privilege of the witness does not depend on the nature of the proceeding in which the testimony is sought or is to be used, but rather on the purportedly *incriminatory nature of the interrogation.* The protective umbrella of the fifth amendment has been specifically held to encompass matters related to both civil and criminal contempt. *See Curcio v. United States*, 354 U.S. 118, 119, 77 S.Ct. 1145, 1147, 1 L.Ed.2d 1225 (1957). *Cf. Haner v. United States*, 440 U.S. 1308, 99 S.Ct. 1485, 59 L.Ed.2d 762 (1979); *In re Campbell*, 628 F.2d 1260 (9th Cir.1980); *In re Grand Jury Proceedings*, 562 F.2d 334 (5th Cir.1977); *NLRB v. Trans Ocean Export Packing, Inc.*, 473 F.2d 612 (9th Cir. 1973).

 The privilege against self-incrimination is as broad as is necessary to guard against the mischief from which protection is sought. It is, therefore, not to be interpreted in a hostile or niggardly fashion but rather in a liberal spirit. *Spevack v.*

*Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Ullmann v. United States*, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 *reh'g denied*, 351 U.S. 928, 76 S.Ct. 777, 100 L.Ed. 1457 (1956); *Quinn v. United States*, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964 (1955); *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). To invoke the privilege, it is not necessary that the witness show that his testimony would be certain to subject him to prosecution, or that it will prove the whole crime, unaided by other evidence. It is enough if there is a reasonable possibility of prosecution, and if the testimony, although falling short of proving the crime in its entirety, will tend to a conviction when combined with evidence from other sources. *Kastigar v. United States, supra; In re Gault, supra; Blair v. United States, supra.* Thus, the privilege covers not only answers that would in themselves support a conviction, but likewise embraces those which would *furnish a link* in the chain of evidence needed to prosecute, *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *Hoffman v. United States, supra; Brown v. Walker*, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896), or which *might lead* to other evidence that could be used in a criminal prosecution against the witness. *Kastigar v. United States, supra; In re Gault, supra.*

 On the other hand, the testimony, to be privileged, must have a real and appreciable tendency to incriminate the witness, not merely one that is remote or fanciful. *Mason v. United States*, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198 (1917); *Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972). *Cf. Slochower v.*

F.2d 140, 149–50 (5th Cir.1962). In a criminal case, the defendant's privilege against self-incrimination is greater than if he were only a witness, encompassing not only the right to refuse to answer questions, but also the right not to be called as a witness at his trial. A witness

only has the right to refuse to answer incriminating questions by claiming this privilege, but has no immunity for other inquiries. *Garner v. United States*, 501 F.2d 228 (9th Cir.1972), *aff'd*, 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976).

*Board of Higher Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 *reh'g denied,* 351 U.S. 944, 76 S.Ct. 843, 100 L.Ed. 1470 (1956). Nonetheless, to sustain the privilege, it need only be evident that a responsive answer to the question, or an explanation of why it cannot be answered, is potentially incriminating. *Hoffman v. United States, supra,* 341 U.S. at 486–487, 71 S.Ct. at 818–819.

■ Set against these rules, let us examine Kave's refusal to testify. In this respect we must commence by restating several facts that are of primary importance. First of all, we must keep in mind that the order of reference to the master directed him to inquire not only into possible civil contempt of the district court's orders, but, significantly, as to whether the matter should be referred to the United States Attorney for possible criminal contempt prosecution against Sisselman and Workroom "or any agents ... or persons acting in concert and participation with either or both." If there was any doubt after the serving of the subpoena, that Kave, in her individual capacity, was at least a secondary target of this "possible criminal contempt prosecution," this ambivalence was removed when at the August 27, 1984 hearing the master ruled that there was no right to claim an attorney-client privilege because "there had been a *prima facie* showing that Mr. Sisselman sought and utilized Ms. Kave's advice and assistance in order to further a fraud upon the Court." Thereafter it became patently

clear that Kave's answers to the master's interrogation could provide evidence, or a link in a chain of evidence, that could later be used against Kave not only in a prosecution for criminal contempt,[24] but most likely also for criminal conspiracy.[25] Irrespective of what other evidence was in the possession or within the knowledge of the master, the subject-matter of Kave's interrogation was directed towards implicating her, *through her own testimony,* with acts that could lead, quite realistically, to her own criminal prosecution. There can be no question but that Kave was entitled to the full protection of the fifth amendment against such interrogation.

■ A separate inquiry is required as to Kave's conduct regarding the documents. The Supreme Court originally held the fifth amendment to bar the production under court order of one's own personal documents in his possession, thus giving rise to the *Boyd* "private papers doctrine." *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *Ballmann v. Fagin,* 200 U.S. 186, 26 S.Ct. 212, 50 L.Ed. 433 (1906); *see generally* Note, *The Life and Times of* Boyd v. United States *(1886–1976),* 76 Mich.L.Rev. 184 (1977). The rule today, however, is more limited. The compelled production of such documents is prohibited only if there are testimonial aspects to the act of production itself. *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984).[26] This

---

**24.** 18 U.S.C. § 402:

Any person, corporation or association willfully disobeying any lawful writ, process, order, rule, decree, or command of any district court of the United States or any court of the District of Columbia, by doing any act or thing therein, or thereby forbidden, if the act or thing so done be of such character as to constitute also a criminal offense under any statute of the United States or under the laws of any State in which the act was committed, shall be prosecuted for such contempt as provided in section 3691 of this title and shall be punished by fine or imprisonment, or both.

**25.** 18 U.S.C. § 371:

If two or more persons conspire either to commit any offense against the United States,

or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

**26.** We recognize that some courts and commentators reject this statement of the rule, maintaining that the *Boyd* doctrine and its content-based fifth amendment analysis was not limited or overruled by *Fisher* and its progeny. *See, e.g.,*

rule extends to the business records of a sole proprietor. *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984). In this context, the rule has three elements: The fifth amendment protects against compulsory surrender of (1) personal business records, (2) in the possession of a sole proprietor or practitioner, (3) only with respect to the testimonial act implicit in the surrender itself. *Fisher, supra; Doe, supra.*

The appellees urge, and the district court so found, that a fourth requisite should be added: that the documents be "self-created." For this proposition they rely upon language used by us in *In re Grand Jury Proceedings (Martinez)*, 626 F.2d 1051, 1054, 1056 (1st Cir.1980), and *United States v. Doe*, 628 F.2d 694, 696 (1st Cir. 1980). We indicated in *Doe* that:

> After *Fisher v. United States* ... it was clear that the subpoena of business records implicates the Fifth Amendment only when those records are possessed by the individual who created them .... Thus, to gain even the limited privilege afforded by *In re Grand Jury Proceedings, supra*, the custodian of the records must show that the records he possesses are those of his sole proprietorship and that he created them ....

*Id.* at 696.

▮▮ A recent decision of the Supreme Court, however, namely *United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984), leads us to conclude that perhaps we read too much into *Fisher*, which, we must concede, does not contain explicit language requiring "self-creation" as part of the Court's new emphasis on the possible incriminatory testimonial aspects of producing documents. Interestingly enough, although the Court cites our *In re*

*Grand Jury Proceedings (Martinez)* with approval, 104 S.Ct. at 1242 n. 10, that case is noted by the Court for the proposition that *Fisher* ended the content-oriented approach to fifth amendment protection in document production, substituting for it the new *Fisher* emphasis. No mention is made by the Court of our "self-creation" requirement. Indeed the Supreme Court could not have intended such a requirement were it to reach the result that it did in that *Doe* case, because many of the documents it ruled were protected under the *Fisher* doctrine were obviously *not* "self-created" by Doe. *See United States v. Doe*, 104 S.Ct. at 1239 n. 1, n. 2 (bank statements, telephone company statements of calls and telegraphs, all correspondence and memorandum, bid bonds, and contracts).

Furthermore, in reconsidering the teachings of *Fisher* in the light of the specific issue now before us, it is apparent that the Court was not relying on a "self-creation" requirement in rejecting *Fisher's* claim of privilege. Had that been the intended thrust, rather than the incriminating testimonial aspects of production of the documents, it would have rejected the claim of privilege outright on the basis that the documents subpoenaed had been written by the accountant, not by the person in whose possession they presumably were. But instead, the Court considered the facts and rejected the claim of privilege *only* because it concluded that the act of producing could not be found to have testimonial incriminating aspects. *Fisher v. United States*, 425 U.S. at 411, 96 S.Ct. at 1581.

We think the Supreme Court decision in *Doe* has effectively overruled the self-creation requirement that we established in such cases from this circuit as our own *Doe* case and *In re Grand Jury Proceedings*, 626 F.2d 1051, 1054, 1056 (1st Cir.1980).[27]

United States v. Doe, 465 U.S. 605, 104 S.Ct. 1237, 1245–46, 79 L.Ed.2d 552 (1984) (Marshall, J., concurring); *United States v. (Under Seal)*, 745 F.2d 834, 839 (4th Cir.1984), *cert. granted*, —— U.S. ——, 105 S.Ct. 954, 83 L.Ed.2d 962 (1985); *United States v. Miller*, 660 F.2d 563, 566–67 (5th Cir.1981), *vacated on other grounds*, 685 F.2d 123 (5th Cir.1982); Cramer, *Back from the Brink:* Boyd's *Private Papers Protection and*

*the Sole Proprietor's Business Records*, 21 Am. Bus.L.J. 369 (1984).

27. In those cases we were focusing on the compelled authentication that may occur when a person produces documents he himself created in response to a subpoena. There can be other situations, however, involving non-self-created documents, where producing the documents

We turn now to consider whether the specific documents involved here meet the three-point test stated above, thus warranting fifth amendment protection against compulsory production. The documents here in question concern three categories of records: [28]

(1) Notes and memoranda written by Martha R. Kave regarding preparation for and conduct of the hearing on the Petition for Contempt in September, 1983. ("Kave Notes")

(2) Office diaries, billing records and telephone logs for the period from July 1, 1983 to February 1984. ("Office Records")

(3) Notes, letters and other correspondence written by Sidney Sisselman and sent or delivered to Martha R. Kave for the period from July 1, 1983 to February 1984. ("Sisselman Notes")

The Kave Notes consist of various sheets of legal size note paper in Kave's own handwriting. They relate to her legal research on the original contempt action, the settlement discussions, and the original contempt hearing and examination of witnesses.[29] The Office Records consist of an appointment diary, time sheets, billing records and telephone logs maintained by Kave or her staff as part of her business operations. The Sisselman Notes are fif-teen pieces of handwritten correspondence between Sisselman and Kave dating from July 16, 1983 to October 19, 1983.

To these facts we should add that Kave is a sole practitioner, and that all of these documents, although directly connected with the practice of her profession, are in the possession of Kave not in a representative capacity [30] but rather constitute her personal business records, as will be discussed hereafter.

There is no dispute that the Office Records are Kave's personal property. However, the master found, and the district court affirmed, that the Kave and Sisselman Notes were not the personal property of Kave. These rulings are clearly contrary to law.

The question of who has title to these papers is answered by reference to the property law of Massachusetts. In this respect the case of *Ipswich Mills v. Dillon*, 260 Mass. 453, 157 N.E. 604 (1926), is controlling.

In *Ipswich*, a case that has never been reversed or modified by the Supreme Judicial Court, the plaintiff sought possession of various categories of papers held by his accountants. The court refused to compel their production, holding that the papers were the personal property of the account-

---

may have incriminating testimonial consequences, such as admitting the existence and possession of the documents. *See, e.g., Matter of Grand Jury Empanelled March 19, 1980*, 680 F.2d 327, 335 n. 12 (3d Cir.1982). The focus should not be on whether respondent created the document but on whether any incriminating testimonial communication inheres in the act of producing it.

**28.** They involve not only those covered initially by the subpoena (*see supra* note 8), but also those subsequently covered by the district court's order of October 19, 1984.

Pursuant to the post-appeal stipulation, these documents were so characterized by Kave in her *in camera* appearance before the master on October 22, 1984. Both the master, in his November 2d report and recommendation, and the district court, in its December 4th memorandum and order, adopted these designations. The district court also concluded that "the evidence establishes a *prima facie* attempt by Ms.

Kave to assist her client in avoiding the Order of this Court."

It should be emphasized that Kave's post-appeal productions are not the substance of the present appeal. For purposes of the present appeal we only have before us Kave's *past* conduct. Kave's post-appeal production does not render that past conduct moot in terms of the civil contempt remedy granted by the district court or any criminal or disciplinary proceedings to which Kave may be exposed as a result of that past conduct.

**29.** This information and the subsequent factual findings are extracted from the master's report which is included in the post-appeal stipulation.

**30.** A person who holds documents in a representative capacity may not usually claim a fifth amendment privilege regarding their production. *See United States v. Doe*, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984). *See also Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976).

ants. Among the documents sought were the accountants' working papers, prepared in connection with the defense of a tax claim for the plaintiff-client. The court stated:

> The work sheets ... were the defendants' property. They were made by them while engaged in their own business. The paper on which the computations were made belong to them. They were not employed to make these sheets. The sheets were merely the means by which the work for which the defendants were employed might be accomplished. The title to the work sheets remained in the defendants after the computations were made. In the absence of an agreement that these sheets were to belong to plaintiff, or to be held for it, they were owned by the defendants.

260 Mass. at 457–458, 157 N.E. 604.

█ The Kave Notes are the substantial equivalent of the accountants' work sheets in *Ipswich* and are the personal property of Kave.

█ As in the present Sisselman Notes, *Ipswich* also involved a dispute regarding who had ownership of letters and correspondence sent by the client to the accountants. In this respect the court ruled:

> The original letters from the plaintiff to the defendants belong to the defendants. They were the recipients, and, therefore, owned them. It was decided in *Baker v. Libbie*, 210 Mass. 599, 606 [97 N.E. 109 (1912)], after an exhaustive review of the authorities, that as a general rule the publication of letters may be restrained by the author, but in the absence of some special arrangement the recipient of the letter is the owner.

*Ipswich Mills v. Dillon*, 260 Mass. 453, 457, 157 N.E. 604 (1926). The Sisselman Notes are, therefore, also the personal property of Kave in accordance with the property law of Massachusetts.

█ Thus the first point of the text is met with respect to all three categories of documents; all are personal business records. The second point is also met, for the documents were allegedly in the possession of Kave, a sole practitioner.

Finally, then, we must decide whether the production of these documents constitutes incriminatory testimonial acts by Kave. We believe the answer to this question is in the affirmative. The production of the Kave Notes constitutes an incriminatory testimonial act because it is the legal equivalent of identifying and authenticating evidence that may be used in connection with conduct that the district court found to be *prima facie* evidence of delictual activity. The conclusion as to the Office Records must be the same. These records reportedly contain possibly incriminating evidence, which, if produced, would entail compulsory authentication by Kave. As to the Sisselman Notes, whether particular letters written by Sisselman were ever actually received by Kave may be material. Kave's compliance with the subpoena would implicitly admit possession and hence receipt. Thus production by Kave under these circumstances, particularly considering that they are the originals in her possession, could constitute an incriminatory testimonial act.

In sum, it appears that Kave's refusal to produce the documents within all three categories was protected under the fifth amendment, because the production of these personal business records, which were in her possession, could have constituted incriminatory testimonial acts.

In view of the above findings the decision of the district court is reversed.

*Reversed.*