Kevin W. MURPHY, By and Through his legal guardians, Kevin C. and Janice MURPHY

v.

TIMBERLANE REGIONAL SCHOOL DISTRICT.

Civ. No. 90–265–SD.

United States District Court, D. New Hampshire.

May 26, 1994.

Michael R. Chamberlain, Manchester, NH, for plaintiffs.

Gerald M. Zelin, Salem, NH, for defendant.

*ORDER*

DEVINE, Senior District Judge.

This order addresses the motion filed by plaintiff Kevin W. Murphy, who proceeds by and through his parents and legal guardians Kevin C. Murphy and Janice Murphy, to enforce the judgment upon this court's May 10, 1993, order as to plaintiff's claim for compensatory education under the Individuals with Disabilities Education Act (IDEA) (codified at 20 U.S.C. § 1400, *et seq.*).[1]

1. "[The IDEA] requires ... all participating states [to] adopt policies assuring all students with disabilities the right to a 'free appropriate public education.' 20 U.S.C. § 1412(1). New Hampshire has adopted the required policies

Plaintiff's motion requests that this court (1) enforce its May 10, 1993, order awarding plaintiff two years of compensatory education and (2) award additional relief for harm caused by defendant's failure to comply with said order.[2] Defendant Timberlane Regional School District objects.

A federal court may assert ancillary jurisdiction when necessary to give effect to its judgment. *E.g., Finley v. United States,* 490 U.S. 545, 551, 109 S.Ct. 2003, 2007–08, 104 L.Ed.2d 593 (citing *Local Loan Co. v. Hunt,* 292 U.S. 234, 239, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934); *Julian v. Central Trust Co.,* 193 U.S. 93, 112–14, 24 S.Ct. 399, 407–08, 48 L.Ed. 629 (1904)). Accordingly, this court has ancillary jurisdiction to enforce the judgment upon the May 10, 1993, order.

The court has reviewed the testimony, exhibits, and legal memoranda provided during and after the hearing held on May 3–4, 1994, with respect to plaintiff's motion.

### 1. Background

Kevin W. Murphy was born on July 9, 1968. He is a disabled individual who is entitled to special educational services under the Act. Kevin's disabilities include spastic paraplegia, cortical blindness (difficulty processing visual stimuli), tactile agnosia (difficulty processing tactile input), and mild mental retardation.

In 1976, the Murphys moved to Plaistow, New Hampshire, which is in the Timberlane Regional School District (Timberlane or the district). In September 1981, Kevin was transferred from his previous placement to a special program at Charlotte Avenue School, a public elementary school in Nashua, New Hampshire. Although Kevin's parents had originally agreed to this new placement, they soon became concerned about the appropriateness of the placement, and expressed their objections to Kevin's teacher and to Timberlane's special education administrators. In December 1981, Kevin suffered a seizure at home, and his parents decided not to return Kevin to school after the winter break.

In January 1982, the school superintendent authorized the director of special education to provide tutorial services to Kevin in his home. A year later, the State Department of Education strongly recommended that the district provide Kevin with home-based instruction. No such services were ever provided.

Mr. Murphy wrote letters to Timberlane in January and February 1982, notifying the school district of his decision to keep Kevin at home, complaining that Kevin was being denied an education, and threatening to bring an action against the district. Kevin remained at home throughout 1982 and 1983.

Between January 1982 and January 1984, numerous IEP [Individualized Education Program [3]] meetings were held between Kevin's parents and district officials in an attempt to develop an appropriate program for Kevin. Although the parties' accounts of the facts differ on who was cooperative and who was obstinate, it is clear that there were a number of disagreements over the appropriateness of different proposed placements and evaluations. The Murphys rejected a number of

---

and attempts to comply with the requirements of the Act."
*Murphy v. Timberlane,* 22 F.3d 1186, 1188 n. 2 (1st Cir.1994) (*Murphy III*) (quoting *Murphy v. Timberlane Regional School Dist.,* 973 F.2d 13, 14–15 (1st Cir.1992) (*Murphy I*)).

**2.** The court construes this request for additional relief as a request for civil contempt sanctions.

**3.** "As defined by [the IDEA], the term 'free appropriate public education' refers to the special education and related services that must be provided in conformity with an individualized education program (IEP)." 20 U.S.C. § 1401(a)(20). An IEP is a statement of the educational program which must be written for each child and designed to meet each child's unique needs. 20 U.S.C. § 1401(a)(19). The IEP is developed by a team including a qualified representative of the local educational agency, the teacher, the parents or guardian, and, where appropriate, the student. *Id.* ... An IEP is appropriate under [the IDEA] if it provides instruction and support services which are reasonably calculated to confer educational benefits to the student. *Board of Education v. Rowley,* 458 U.S. 176, 203–207, 102 S.Ct. 3034, 3049–51, 73 L.Ed.2d 690 (1982); *Abrahamson v. Hershman,* 701 F.2d 223, 226–27 (1st Cir.1983).
*Murphy III, supra,* 22 F.3d at 1188 n. 2.

IEPs presented to them by the district. In June 1982, Kevin attended school in a third grade classroom for the last two weeks of the school year. The purpose of this placement was to allow Timberlane an opportunity to evaluate Kevin and assess his needs so that an appropriate IEP could be developed for the following school year.

In November 1982, the district initiated truancy proceedings against Kevin's parents because of Kevin's absence from school. These proceedings were never completed. In January 1984, the Pupil Placement Team finally agreed on a placement for Kevin in the Get Set Program at Pinkerton High School. Although Kevin's May 1985 IEP indicated that Kevin might complete the Get Set Program as early as June 1987, Kevin remained in the program through the end of 1988–89 school year.

In May 1988, Kevin's Pupil Placement Team met to develop an IEP for the 1988–89 school year. Although Kevin would turn 21 in July 1989, there was evidence that the Team assumed that this was not the final IEP to be developed for Kevin and that Kevin would be permitted to continue his education until he completed the program at Pinkerton High School. In November 1988, Mr. Murphy met with Timberlane's Superintendent, Terrance Holmes, to discuss whether Timberlane would provide schooling beyond Kevin's 21st birthday. Mr. Holmes agreed to present Mr. Murphy's request to the School Board. On January 5, 1989, the Superintendent recommended to the School Board that Kevin be allowed to continue at Pinkerton High School beyond his 21st birthday. The Board rejected the recommendation by a vote of six to three.

Kevin turned 21 on July 9, 1989. On July 24, 1989, George Wright, Timberlane's local education agency representative and a member of Kevin's IEP team, wrote to Kevin's parents enclosing an An-

nual Statement of Placement discharging Kevin as a special education student. *Murphy I, supra,* 973 F.2d at 14–15.

Kevin is now twenty-five years of age and no longer entitled to a free public education under New Hampshire law. *See* N.H.Rev.Stat.Ann. § 186–C:9 (disabled "child shall be entitled to continue in an approved program until such time as the child has acquired a high school diploma or has attained the age of 21, whichever occurs first"); *see also id.* § 186–C:2 (similar). In August 1989 less than one month after Kevin had been discharged, the Murphys requested an administrative hearing. The Murphys maintained that Kevin was entitled to compensatory educational services beyond age twenty-one as a consequence of Timberlane's failure to provide special education during the two-year period from January 1982 through January 1984. The Murphys specifically alleged that Timberlane had violated the IDEA by failing either to propose an IEP acceptable to all IEP team members or to initiate administrative proceedings to resolve the IEP impasse in accordance with N.H.Code Admin.R.Ed. 1125.01(b)(3)–b ("section 1125").[4]

The administrative hearing officer determined that the Murphys' claim for compensatory educational services was barred by laches. The United States District Court for the District of New Hampshire granted summary judgment in favor of Timberlane, affirming the administrative decision. We vacated the district court decision and remanded for further findings relating to the laches defense. *Murphy I,* 973 F.2d at 18. On remand, after receiving evidence and argument on both the laches defense and the cross-motions for summary judgment, the district court [in its May 10, 1993, order] rejected Timberlane's laches defense, denied its motion for summary judgment based on a statute of limitations defense, and granted summary judgment for the Murphys. *Murphy v.*

---

**4.** Under this provision, " 'if the parents disagree with a proposed IEP and the local educational agency feels it would be in the best interest of the child to implement the IEP, the local agency is *required* to initiate administrative procedures to obtain permission from a hearing officer to implement the IEP.' " *Murphy III,* 22 F.3d at 1195 (quoting *Murphy I,* emphasis in *Murphy III* ).

*Timberlane Regional Sch. Dist.,* 819 F.Supp. 1127 (D.N.H.1993) (*"Murphy II "*).

*Murphy III, supra,* 22 F.3d at 1188–89 (footnote omitted).

In granting summary judgment for the Murphys, this court found "that there is no genuine issue regarding the fact that defendant failed to provide Kevin with a free, appropriate public education during 1982 and 1983, years in which he was entitled to such under the Act." *Murphy II, supra,* 819 F.Supp. at 1136. Accordingly, the court ordered defendant "to provide Kevin with two years of compensatory education beginning at the commencement of the school year which starts in September 1993." *Id.* Said order included the following instructions and warning. "Kevin's program for each of the two years is to be determined according to the IEP procedures set forth in the Act at 20 U.S.C. § 1401(a)(20) (Supp.1993).[5] *Delays in this process resulting from bad faith on the part of either party will be addressed using the full range of equitable powers available to the court." Id.* (emphasis added).

Pursuant to the May 10, 1993, order, the parties agreed upon the formation of an IEP team to be composed of the following individuals: (1) Colleen Bovi, Director of Pupil Personnel Services, Timberlane Regional School District; (2) Dr. Bruce Cushna, Associate Director, Developmental Evaluation Clinic, The Children's Hospital, Boston, Massachusetts; Adjunct Associate Professor in Special Education, Boston College; Principal Associate in Pediatrics (Psychology), Member of the Faculty of Medicine, Harvard Medical School; (3) Francis C. Driscoll, Kevin W. Murphy's Special Needs Teacher at the Get Set Program; (4) Janice Murphy; and (5) Kevin C. Murphy.

On August 13, 1993, Ms. Bovi, Mr. Driscoll, and Mr. and Mrs. Murphy met to discuss the implementation of the May 10, 1993, order. Transcript of August 13, 1993, Meeting (Plaintiff's Exhibit 14). The same four team members met again on August 23, 1993. Transcript of August 23, 1993, meeting (Plaintiff's Exhibit 15).

On September 24, 1993, all five team members met to develop an IEP for Kevin. Transcript of September 24, 1993, Meeting (Plaintiff's Exhibit 16). The full team met once again on October 29, 1993, with Mr. Driscoll participating by telephone. Transcript of October 29, 1993, Meeting (Plaintiff's Exhibit 17). No further team meetings occurred.

Team members Dr. Cushna, Mr. Driscoll, and Mr. and Mrs. Murphy approved an IEP which recommended, inter alia, placement in a residential program; specifically, the Perkins School for the Blind adult residential program.[6] *See, e.g.,* Individual Education Program for Kevin W. Murphy Developed Pursuant to Order by Judge Shane Devine of the Federal District Court, District of New Hampshire, entered May 10, 1993 (Plaintiff's

---

**5.** Section 1401(a)(20) provides,

The term "individualized education program" means a written statement for each child with a disability developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include—

(A) a statement of the present levels of educational performance of such child,

(B) a statement of annual goals, including short-term instructional objectives,

(C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs,

(D) a statement of the needed transition services for students beginning no later than age 16 and annually thereafter (and, when determined appropriate for the individual, beginning at age 14 or younger), including, when appropriate, a statement of the interagency responsibilities or linkages (or both) before the student leaves the school setting,

(E) the projected date for initiation and anticipated duration of such services, and

(F) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.

In the case where a participating agency, other than the educational agency, fails to provide agreed upon services, the educational agency shall reconvene the IEP team to identify alternative strategies to meet the transition objectives.

**6.** This program is no longer available.

Exhibit 13) (the IEP"), at 2 (labeled page 1 of 5), Appendix B at 4, 6. Ms. Bovi did not sign the IEP. She also did not offer another IEP. Timberlane Regional School District's Pretrial Memorandum of Law at 5.

Kevin W. Murphy was evaluated at the Conklin Center for Multihandicapped Blind during the period of November 29, 1993, to December 9, 1993. Letter from Robert Kelly, Assistant Executive Director, Conklin Center, to Kevin Murphy, Ph.D., dated January 3, 1994, enclosing evaluation (Plaintiff's Exhibit 8) at 1. On January 3, 1994, the Conklin Center approved Kevin's placement at its facility. *Id.* at 3.

On March 2, 1994, plaintiff filed the motion to enforce judgment. Subsequently, defendant filed a motion with the United States Court of Appeals for the First Circuit to stay this court's May 10, 1993, order. That motion was denied.

*2. The May 3–4, 1994, Hearing*

The Statement of Placement section of the IEP (Plaintiff's Exhibit 13 at 1 (labeled as page 1 of 1) provides:

> The IEP/Placement Team considered the following placements and found each to be inappropriate placements at which to implement this IEP:
>
> 1. Home-based tutoring with community support services in southern New Hampshire.
>
> 2. Pinkerton Academy, Derry, NH.
>
> 3. The Carroll Center for the Blind, Newton, MA.
>
> 4. Individualized community based program.
>
> The members of the IEP/Placement Team whose signatures are affixed below recommend that Kevin W. Murphy be placed and this IEP be implemented at THE CONKLIN CENTER FOR THE MULTIHANDICAPPED BLIND, in Daytona, Florida.

Appearing at the hearing as witnesses for plaintiff were Colleen Bovi, Dr. Bruce Cushna, Francis G. Driscoll, and Kevin C. Murphy. Appearing as a witness for defendant was Cynthia Maher, an employee of Region 10 Community Support Services, Inc., Atkinson, New Hampshire. The parties stipulated as to the testimony of defendant's witness Jo–Ann Sowers, Ph.D., Project Director/Research Associate Professor, Institute on Disability, University of New Hampshire, Concord, New Hampshire, who did not testify at the hearing.

*Bruce Cushna, Ph.D.*

The court finds credible the testimony of Dr. Bruce Cushna.

Dr. Cushna testified that he has worked with the visually handicapped throughout his career and that he is certified by the Massachusetts Department of Education as an evaluator of low vision/blind students. He stated that he conducts over three hundred evaluations per year.

Dr. Cushna testified that he first saw Kevin in early 1972, that he was assigned as case coordinator to the Murphys, and that he felt Kevin had a lot of potential for learning. Dr. Cushna stated that he has followed Kevin for over twenty years and has visited all of Kevin's educational facilities. He stated that in the early years he participated in Kevin's evaluations and IEPs as an advisor and that he was invited to become a member of Kevin's team by Ms. Bovi's predecessor, Dr. George Wright. Dr. Cushna stated that he visited Pinkerton Academy three or four times.

Dr. Cushna testified that Ms. Bovi invited him to join the IEP team assembled pursuant to the May 10, 1993, order and identified Defendant's Exhibit D, a letter from Colleen M. Bovi to Dr. Cushna dated September 21, 1993, as the letter of invitation. Exhibit D states,

> Thank you for agreeing to participate on Kevin's IEP/Placement Team. Your perspective on Kevin's needs will assist the team in developing an appropriate Individualized Education Program for him.
>
> Enclosed please find copies of the Timberlane Regional School District's IEP forms, should you have the opportunity to generate ideas prior to the meeting. The team has agreed that the Perkins Evaluation will greatly assist in the development of goals and objectives in meeting Kevin's needs.

The IEP/Placement Team will convene on Friday, September 24, 1993, 9:30 A.M., at the Superintendent of Schools Office, 30 Greenough Road, Plaistow. Directions are enclosed.

Please feel free to contact me if I can provide you with any additional information.

Dr. Cushna stated that he read the May 10, 1993, order and understood that it called for getting Kevin in school as soon as possible by drawing up an IEP and then making a decision on placement. He stated that he thought his view would be considered.

Dr. Cushna testified as to his 1993 evaluation of Kevin (Plaintiff's Exhibit 2, at 4–5 (letter from Bruce Cushna, Ph.D., to Kevin C. Murphy dated Jan. 18, 1993)). He stated that he used the Perkins School for the Blind evaluation (Plaintiff's Exhibit 1) and had a discussion with Kevin. He stated that he did an individualized assessment, and that he determined the Perkins School for the Blind evaluation to be currently reliable. He stated that he did not administer any new instruments, that it was not necessary to repeat the testing, and that what he did was a reliability check. Dr. Cushna testified that he did not do a full evaluation of Kevin in 1993 because he felt he didn't need to repeat the Perkins School for the Blind evaluation which he considered to have been well done, and which he termed "an adequate assessment basis to make decisions on from a psychological viewpoint."

In his 1993 evaluation of Kevin, Dr. Cushna states in part,

While it is difficult to assess exact amounts of what Kevin lost by not being enrolled in a school program, I think best approximations would correlate lost time to time needed for current remediation and rectification. That is, if he lost 3 years, then he is still probably owed 3 years. However, there is also another prospective view which would be that [it] probably is going to take at least a year to get Kevin moving ahead at the rate he was progressing when programs were terminated. I should then recommend a solid year[']s work on skill advancement, and then [an] additional year of training to help him in transition, independent living, and vocational areas. It seems as though from either viewpoint, at least 3 years['] programming will be required.

It is indeed unfortunate that Perkins can no longer continue their long standing, quality program. And additionally, I know of no other school besides the Conklin Center in Daytona Beach, which offers the needed training and therapy.

Plaintiff's Exhibit 2, at 4.

Dr. Cushna stated that it is very important that a specialist in visual handicaps work with Kevin at this time. He stated that no one else in the IEP team identified himself or herself as having such expertise.

Dr. Cushna identified Plaintiff's Exhibit 12, Work in Progress, Development of Individual Education Program for Kevin W. Murphy, Compensatory Education in Compliance with Order of Federal District Court of New Hampshire 10 May 1993, as containing his conception of what Kevin's IEP should look like. *See also id.* at Appendix A. He described the areas covered as including communication, involving self-assertion and group poise. He noted the importance of group work, stating that this is very important for Kevin at this stage because he is a young adult and did not receive transition training. Dr. Cushna stated that the abrupt ending of Kevin's education weakened his self-reliance and self-confidence. Dr. Cushna described the abrupt ending by stating that Kevin's program ended without a transition plan, that he had thought Kevin was going to be kept in school another year, and that defendant's termination of Kevin's program was a shock to Kevin and to Dr. Cushna himself.

Dr. Cushna testified that section 7 of the Work in Progress, regarding guidance, comes from the Perkins School for the Blind evaluation. He stated that Kevin needed the assignment of particular guidance personnel to deal with the problems of the abrupt ending. He stated that Kevin needed a skilled guidance counselor with knowledge of the blind because the particular quality of not sharing the visual sensation produces unique psychological effects. He said it is

important for people, as they move into adulthood, not to feel alone in the world. Regarding the section on functional academics, Dr. Cushna stated that Kevin needs to advance in math and written communication skills to compensate for not doing so in earlier years.

Regarding the section on civics, Dr. Cushna stated that this included subjects ranging from living with other people to being governed.

Dr. Cushna testified that everyone on the team agreed that the goals set forth in the Work in Progress were good goals.

Dr. Cushna testified as to the IEP (Plaintiff's Exhibit 13). He stated that the annual goal of re-acclimating Kevin to an educational environment, IEP at 3 (labeled page 2 of 5), was included because Kevin had been out of school for a long time, and that once you break momentum, it needs to be "re-revved." He stated that the IEP provided for a twelve-month period so momentum could be sustained and so there would not be an added discontinuity. He stated that the longer Kevin remains out of school, the more he will regress.

Regarding the annual goal of initiating training in skills which can lead to independent living an vocational success, Dr. Cushna testified that Kevin's skills are "sorely lacking" and that he needs to start as soon as possible.

Dr. Cushna testified regarding placements listed in the Statement of Placement section of the IEP as inappropriate. Dr. Cushna stated that as to the home-based tutoring option, the team discussed it thoroughly and determined that Kevin should not be trained at home, and that Ms. Bovi agreed. He stated that Pinkerton Academy was inappropriate and that he thought the team knew Pinkerton would not house such a program for Kevin.

Plaintiff's Exhibit 32 contains (1) a letter from defendant's counsel Gerald M. Zelin to plaintiff's counsel Michael R. Chamberlain dated October 12, 1993, and (2) a copy of Program Proposal for Settlement Negotiations [7] Kevin W. Murphy 1993–1994 School Year. The letter states in part,

I am sorry about the delay in sending you a description of the special education program which Timberlane may be willing to provide, for one year, as part of a settlement of the family's claim for compensatory education.

Enclosed for your information is a memorandum from Colleen Bovi, which describes the services which would be provided. This is without prejudice and solely for purposes of settlement discussions.

Pinkerton Academy has just informed the school district that it will *not* accept Kevin for one or two years of compensatory education. Therefore, the enclosed program could not be implemented at Pinkerton Academy. Ms. Bovi is exploring other facilities which might be willing and able to implement the enclosed program. We may have additional information regarding those facilities for presentation at the settlement conference in Boston tomorrow.

Plaintiff's Exhibit 32, at 1 (emphasis in original).

Dr. Cushna stated that the Carroll Center was an inappropriate placement because it is a rehabilitation center, not a school, and stated that he thought the team was supposed to put Kevin in a placement where he would receive academic training. He stated that he didn't believe the Carroll Center could provide the academic training Kevin needed and that the Carroll Center staff told this to Mr. Murphy and him during a visit there. Plaintiff's Exhibit 10 is a letter dated February 28, 1994, from Richard Connors, Program Director, the Carroll Center, to Kevin C. Murphy. Exhibit 10 states,

It was a pleasure to meet you and your son this morning, and I thank you for your interest in the Carroll Center as a possible placement for Kevin.

I have reviewed Kevin's medical records and the reports from his evaluation at the Perkins School and at the Conklin Center.

---

7. The parties met at settlement conferences held by the First Circuit on September 13, October 13, and November 3, 1993.

I do not consider the Carroll Center an appropriate placement for Kevin at this time.

Plaintiff's Exhibit 10.

Dr. Cushna stated that he was frustrated, having hoped that at the September 24 meeting they would have had something on the table.

Dr. Cushna testified as to defendant's purported proposal of an individualized community based program. He stated that at the October 29 meeting he did not sign the IEP. He stated that Timberlane had not drawn up a program or shown the team what an individualized community-based program meant and that it had not put its proposal in writing. Dr. Cushna stated that he told Ms. Bovi he would wait until Wednesday (November 3) to see what Timberlane would do, but that Timberlane did not provide anything.

Dr. Cushna testified as to the appropriateness of the Conklin Center as a placement for Kevin. He discussed the restrictiveness of a residential placement, pointing out that college students stay overnight. He stated that it is not restricting to let young people go away "to build on their feelings of independence."

Dr. Cushna stated that he visited the Conklin Center on February 7 and met the service providers. He stated that when he visited the Conklin Center he wanted to determine if it had a teacher who could promote Kevin's advancement.

Dr. Cushna testified that the Conklin Center has a structured academic component and has an academic teacher who taught at the Perkins School for the Blind for eight years, is well experienced, and is fully qualified to handle Kevin's academic needs. He stated that if all the components exist at a particular placement, then such placement is appropriate, regardless of how it might be labeled. He stated that the staff at the Conklin Center is "very well qualified" and that he would endorse it.

Dr. Cushna stated that at the Conklin Center he observed small-group activity which he found appropriate for Kevin's age group. He stated that he was impressed by the spectrum of training programs there.

Dr. Cushna testified as to Ms. Bovi's criticism of the Conklin Center. He stated that she was trying to put together a comparable program to the Conklin Center. He stated that such a program would need a very strong administrator to pull it together and that there was no assurance that such a person would be found. He stated that if you pick and choose from various services, the result is not an ongoing process that involves groups, but would be a patchwork with no way to gauge how effective it would be.

Dr. Cushna testified that he did not remember seeing either Defendant's Exhibit I (Program Proposal for Settlement Negotiations, Kevin W. Murphy, 1993–1994 School Year, calling for "individualized program") or Plaintiff's Exhibit 30 (Program Proposal for Settlement Negotiations, Kevin W. Murphy, 1993–1994 School Year, calling for placement at Carroll Center for the Blind), neither of which is dated. He stated that if he had seen either document, he would have remembered because he always objects if such a document is not dated.

Following a recess to permit Dr. Cushna to examine Plaintiff's Exhibit 30 and Defendant's Exhibit I, he testified that he had not seen said documents before. He stated that what Ms. Bovi did describe verbally was inadequate because there were no details. He stated that the team had nothing to act on. He stated that said documents did not contain adequate descriptions because objectives were not spelled out such that there could be measurable results.

Dr. Cushna testified that Plaintiff's Exhibit 30 and Defendant's Exhibit I are sketches, not IEPs, and that said documents are not related to Kevin's needs as set forth in the IEP or to the goals and objectives of the IEP. He expressed irritation that he had spent so much time talking without being given such proposals, and stated, "We were not given anything concrete to consider." Dr. Cushna stated that he attended the October 12 and November 3 settlement conferences and that at the October 12 conference there was discussion as to why Timberlane was not providing a concrete proposal. Dr.

Cushna stated that if there were alternatives, he had a right as a team member to see them in writing, and that if he is spending his time to work with a school district, they have to present something in black and white. Regarding the purported individualized community-based program mentioned by Ms. Bovi, Dr. Cushna stated that she never gave the team anything concrete to consider.

Dr. Cushna stated that the Conklin Center could fulfill Kevin's needs as set forth in the IEP, and that he does not know of any other program that could meet those needs.

Plaintiff's Exhibit 5 is a letter from Robert Kelly, C.R.C., Assistant Executive Director of the Conklin Center, to Kevin C. Murphy dated October 7, 1992. Exhibit 5 states,

> Thank you for your inquiry about our services. The Conklin Center is the *only* agency in the United States specializing exclusively in rehabilitation services for persons who are blind and have one or more additional disabling conditions.
>
> The Conklin Center's specialized approach to rehabilitation and a high staff-to-student ratio permit unparalleled flexibility in tailoring services to meet the unusual needs of clients who often don't "fit in" in more generic settings. The Center offers a continuum of rehabilitation and case management services which extend from facility-based training to community-based independent living and employment services.
>
> For clients who wish to live in the community but may require extended support services, the Center offers open-ended Supported Living and Supported Employment services. These support services afford clients a wide range of choices concerning lifestyles and living arrangements.
>
> I am looking forward to receiving the report from Perkins and hope we can be of service to your son.

(Emphasis in original.)

Dr. Cushna stated that he regretted that the Perkins School for the Blind program was no longer available and further stated that the Conklin Center is the only comparable program.

Dr. Cushna testified regarding the issue of inclusion. He stated that he strongly believes in inclusion, that he has advocated it for many years, and that he strongly advocates it in all children with whom he comes in contact.

Dr. Cushna testified as to the issue of segregating Kevin based on his disabilities, stating that with young children it is easier to promote group inclusion than with a person Kevin's age because it is now more difficult to find a group he can learn with. He stated that training Kevin at home would be inappropriate. He further stated that Kevin must be with other people who are learning, that education takes place in group learning, and that he must be with others learning in a purposeful, organized way. He said that Kevin must be prepared for adult independent living.

He further testified regarding Defendant's Exhibit P, which sets forth a cost estimate for an "Individualized Community Based Program." He noted that the proposed teacher/case manager would have a Master of Education degree, but would not be required to be an expert in visual impairment, and described this as a significant defect. He stated that in such a program Kevin would be more segregated than ever. He stated that the identities of service providers, which are absent from Exhibit P, pose an important question.

*Francis G. Driscoll*

The court finds credible the testimony of Francis G. Driscoll.

Mr. Driscoll testified that he has achieved sixty graduate credits beyond a Master's degree in psychology, that he has been a teacher or school administrator for forty years, that he became a special education teacher in 1960, and that he has been retired for two years.

Mr. Driscoll testified that he first met Kevin when Kevin was a student in the Get Set program, stating that he took another teacher's place and became Kevin's case coordinator/manager. He stated that he worked with Kevin for two and one-half years, that he has seen Kevin since then, having visited Kevin and having had lunch

with Kevin with Mrs. Driscoll. Mr. Driscoll stated that Kevin is a friend of his.

He testified that he became a member of the team at Timberlane's request.

Mr. Driscoll stated that the team unanimously agreed to accept the Perkins School for the Blind evaluation and Dr. Cushna's evaluation as the basis for the IEP.

Mr. Driscoll testified that Appendix C of the Work in Progress (Plaintiff's Exhibit 12) contains his general impressions. He stated that Kevin was always self-deprecating, blaming himself if he had a hard time learning something. He said it is extremely important that Kevin's self-confidence be built up and that this could be achieved if Kevin could learn with other visually impaired individuals. Further, he stated that Kevin was always the only visually impaired individual in the group and would consider himself "a klutz."

Mr. Driscoll stated that his past experience had primarily involved the mentally retarded and that he was not convinced that Kevin is mentally retarded. He emphasized his opinion that Kevin must be taught by someone who has a high degree of skill with the visually impaired.

Mr. Driscoll testified as to being amazed that Kevin went through his whole life without being trained with other sight-impaired people. He stated that it is extremely important to note that Kevin is mildly retarded and would be harmed if he were placed with severely retarded individuals.

Mr. Driscoll confirmed that he signed the IEP and the Statement of Placement section contained therein.

Mr. Driscoll testified that Kevin's placement in a residential school could very well be considered the least restrictive because Kevin could meet new people and make new friends. He stated that a home-based program could be the most restrictive. He stated that Kevin very much wants to go away to school, like his brother, and that Kevin wanted to go to the Perkins School.

Mr. Driscoll stated that the IEP places an emphasis on reacclimating Kevin because Kevin has been away from any kind of educational program for five years. He stated that Kevin needs to get a routine. He discussed the need for a fully integrated program, stating that one can't isolate social skills from academic skills and personal skills.

Regarding Ms. Bovi's purported community-based program, Mr. Driscoll testified that Kevin has to be treated as a whole person. He stated that from the reports he heard the Conklin Center seems to be the only program he has heard of that will do the job. He stated that before the Perkins School for the Blind program closed, that was Kevin's goal, as well as his own.

Regarding whether Kevin has been harmed by the delay in implementing the May 10, 1993, order, Mr. Driscoll stated that Kevin has been harmed, and that every day that goes by is a day lost in Kevin's life.

Mr. Driscoll testified that he took Kevin to Amherst, New Hampshire, for three days for the Special Olympics and that Kevin loved it, that he loved being with other people and staying in a dorm.

Mr. Driscoll testified that he has not visited the Conklin Center. He stated that he does not know if the Conklin Center is a school or a rehabilitation center but that the question is whether it can meet Kevin's needs. He stated that institutionalization is most restrictive, but that this is a matter of semantics.

Mr. Driscoll stated that Pinkerton Academy is not appropriate for Kevin now.

*Kevin C. Murphy*

The court finds credible the testimony of Kevin C. Murphy.

Mr. Murphy testified that he was first contacted by Ms. Bovi regarding implementation of the May 10, 1993, order through the letter from Ms. Bovi to him and his wife Janice dated June 25, 1993 (Defendant's Exhibit A), and that he was subsequently contacted by Ms. Bovi through the letter from Ms. Bovi to him and his wife dated July 2, 1993 (Defendant's Exhibit B).

Mr. Murphy testified that Kevin is very emotionally vulnerable.

The Perkins School for the Blind Evaluation (Plaintiff's Exhibit 1) states in part, "Kevin's thought processes appeared to be logical and coherent, but also quite concrete. There was no evidence of emotional dysfunction, but he showed elements of self-blame and poor self-esteem." Plaintiff's Exhibit 1, at 1. Mr. Murphy testified that he also saw this in Kevin.

Mr. Murphy stated that he had taught Kevin braille but that Kevin has lost his reading skill.

Mr. Murphy testified as to the reason for Kevin's absence from the team meetings. He stated that Ms. Bovi told him at the August 23 meeting that the school district fully intended to delay and that to bring Kevin to this kind of meeting, where his hopes would be raised and where he would have had to understand that this was not going to happen, would have harmed Mr. Murphy's relationship with Kevin. He stated that he did not want to raise Kevin's hopes about going to school when it was not going to happen. He further stated that Kevin desperately wants to go to school.

Regarding the issue of jump-starting Kevin's motivation and confidence, Mr. Murphy stated that Kevin needs time to learn and trust and to trust himself.

Mr. Murphy testified that he had deep concerns about Timberlane's level of commitment to the process of developing an IEP and placement for Kevin. He testified as to his doubts regarding whether the team actually had the authority it needed. He stated that he questioned whether Ms. Bovi had authority from her employers, but that he did not get a clear answer—"not one I trusted."

At the August 13 meeting, Mr. Murphy and Ms. Bovi engaged in the following exchange regarding the IEP process:

MR. MURPHY: ... Do you see this decision process coming about by vote and majority, or do you see it coming about by consensus, unanimity? How will you determine that a decision has been made?

MS. BOVI: I would look at all of the factors. I would look at a consensus. I don't know that we would sit here and take a vote, "everybody raise your hand," because that I don't feel is the appropriate thing to do. I feel that as the LEA representative that I ultimately am the one who has to bring this team to a consensus.

I don't know if that answers your question as to the role of authority.

Plaintiff's Exhibit 14, at 19.

The IEP states in part,

**Part Five: Projected date for the initiation and anticipated duration of services.**

No date can be fixed for the initiation of this IEP because the Timberlane Regional School District has not exhausted its right to appeal the court's order. The IEP/Placement Team has developed this plan owing to the possibility that the Federal Court order of 10 May 1993 may be upheld by the Federal Court of Appeals for the First Circuit.

If that order is upheld and if Timberlane Regional School District has exhausted or waived all its rights to appeal the judgment, the Team anticipates this plan will occupy a one year (twelve month) period which will begin on the day Kevin is enrolled and enters an appropriate educational placement which commits to implement this IEP.

The Team agrees that Kevin's normal school day will involve sixteen hours of instruction and/or guidance.

The Team agrees that Kevin will require extended school year programming to prevent regression and loss of benefit [of] the education he acquires.[8]

Plaintiff's Exhibit 13 at 4–5 (labeled 3 of 5, 4 of 5).

Mr. Murphy stated that Ms. Bovi did not follow up on his invitation to come to the Murphys' home to meet Kevin, or to take Kevin to lunch. He stated that there were several promises by Ms. Bovi that she would call and arrange a meeting. He further stat-

---

**8.** The court notes that at the hearing there was no testimony indicating that the IEP team members who signed the IEP agreed that the May 10, 1993, order would not be implemented until after the school district exhausted its right to appeal said order.

ed that he did not communicate to Bovi that she was no longer welcome in the Murphys' home or to take Kevin out. Mr. Murphy testified as to his outrage that a woman who had never met his child would be meeting with Dr. Cushna and Mr. Driscoll and would unashamedly express her opinions. He testified as to his "continuing concern about the level of her authority and her ability to invest it in this team."

Mr. Murphy testified regarding the Conklin Center. He stated that there is a community built around it, and that it is part of the community. Regarding the staff at the Conklin Center, he stated, "They know Kevin, and what comes next and what he needs."

Regarding Defendant's Exhibit I (Program Proposal for Settlement Negotiations, Kevin W. Murphy, 1993–1994 School Year), Mr. Murphy testified that everything that the team's program demonstrates in specificity, said document lacks. He stated that Exhibit I could be interpreted in any number of ways, and that he was not sure any handicapped child should be subjected to something so "nebulous." He stated that he didn't know what "vision services" meant. He stated that Exhibit I does not identify providers or describe where services would be provided.

Mr. Murphy stated that Exhibit I is the document he had hoped he would have at the September 24 meeting, but that he first saw it the night before the October 13 settlement conference. He said he found the contents of Exhibit I totally irreconcilable with anything discussed with the team.

Mr. Murphy stated that the IEP/Statement of Placement document (Plaintiff's Exhibit 13) came from his computer. He stated that from October 16 through October 29, he assembled the document, after having met with Ms. Bovi on October 3 to work on the IEP with no documents present before, during, or after the meeting.

Mr. Murphy testified that Ms. Bovi did an admirable job of being convivial and that she was doing a good job for Kevin within the limits in which she was allowed to move. He stated that in the mediation meetings Ms.

Bovi's supervisor, Superintendent Holmes, was sitting beside her.

Mr. Murphy testified that the team recommended placement at the Conklin Center knowing that the Conklin Center had to endorse such placement.

*Colleen Bovi*

Ms. Bovi testified that the first team meeting was scheduled for July 12 but was rescheduled for July 19 because key members couldn't be present. She stated that the July 19 meeting was not held because on the Friday before it Kevin C. Murphy told her that he could not discuss his son's case because they were in litigation. She stated that Murphy brought her a letter from his counsel which told her to address all correspondence through his attorney. She stated that she did not think it was appropriate that she would have to communicate through the attorney. She further stated that a meeting was subsequently scheduled for August 13.

Ms. Bovi testified that she had no objection to the appointment of either Mr. Driscoll or Dr. Cushna to the IEP team. She noted that Mr. Driscoll had worked with Kevin previously and had maintained contact with him. She stated that Mr. Driscoll was "very knowledgeable" and that he had expertise in Kevin's specific disability. She stated that she does not have such expertise, noting that Kevin is not emotionally disturbed. She further stated that Dr. Cushna had followed Kevin's case since Kevin was three years old and that Dr. Cushna has expertise in the area of developmental disabilities.

At the August 13 meeting, Ms. Bovi stated,

When I was given a copy of the decision from the U.S. District Court, I was faced with a humongous task. Looking at that— because I have never developed an education plan for an individual such as Kevin before, a 25–year–old adult. My specialty has not been working with adults.

Plaintiff's Exhibit 14, at 15.

Ms. Bovi testified that she wanted Kevin to participate in the IEP process. She stated that she had not met Kevin and had never observed him in a school or community setting. She acknowledged that Mr. Driscoll and Dr. Cushna had observed Kevin in such

settings for a number of years and that they had previously been on IEP teams regarding Kevin.

Ms. Bovi testified that both she and Mr. Driscoll had wanted Kevin to be at team meetings, but that Kevin's father did not want his son there to hear the discussions because Kevin would have suffered. She stated that she understood why Kevin's parents did not want him at the meetings.

At the August 13 meeting, Ms. Bovi and Mr. Murphy engaged in the following exchange:

MS. BOVI: ...

I feel that Kevin needs to be a part of this process. And he was invited to this meeting.

Do you agree with that?

MR. MURPHY: That Kevin was invited to this meeting?

MS BOVI: Ah-huh.

MR. MURPHY: Yes, but the invitation was absolutely improper and unethical. You do not invite the plaintiff to meet with the defendant while litigation is not only ongoing, but at crisis level. The invitation was a sham.

And Kevin could be here had we been able to decide that his right to make decisions was of greater consequence than his right to an impartial hearing. However, if we forgo his right to an impartial hearing, any decisions he makes are moot.

So that's why Kevin is not here. And it's wrong. I mean, and the ogre is circumstance.

MS. BOVI: Okay. With that said ...

MR. MURPHY: Okay.

Plaintiff's Exhibit 14, at 7–8.

At the August 23 meeting, Mr. Driscoll, Ms. Bovi, and Mr. Murphy stated,

MR. DRISCOLL: ....

It's—it's very difficult to get to know Kevin. It's very—

MS. BOVI: That's why I feel it's very important for Kevin to be a member of this team, so he has some input.

MR. DRISCOLL: So do I. It's a problem.

MR. MURPHY: But, how? Colleen— we did invite Colleen, more than invite— she—she's anxious to come and we've asked her to come and see Kevin at home so—and I've thought since, maybe it would be good to take him to lunch. Take him to lunch, take him to pizza, and meet Kevin. But I think, that needs to happen so you can know Kevin.

Plaintiff's Exhibit 15, at 23–24.

Ms. Bovi stated that she met Kevin on one occasion for ten minutes in his father's presence, that the meeting was not very long, was not satisfactory, and was very uncomfortable for everyone. She stated that she was very impressed with Kevin, that he was very affable, that he was a little confused about why he was there, that he used his cane, and that she considered him "a very nice young man."

Ms. Bovi testified that the Murphys were open to having consultants participate to provide information, but not as team members.

At the August 13 meeting, Ms. Bovi stated,

MS. BOVI: ... I see that this team certainly can identify appropriate representatives to achieve what we want to achieve. I feel very strongly about adding people to the team. We don't want to have a team that is going to be so large that we become dysfunctional and don't get anything done.

I believe that we have an obligation to Kevin to be able to have people who can guide us, because it's unusual to develop an education plan for a 25–year–old adult. I feel that it would be in his best interest to have somebody who can guide his area of vocational development, perhaps look at area agencies that would be able to provide services to Kevin either, a part of this program or outside of this program. And that would be agencies such as Region 10.

Plaintiff's Exhibit 14, at 12–13.

The court finds less than credible Ms. Bovi's testimony that she was concerned that the team did not have other representatives to discuss vocational and adult services. The court also finds less than credible Ms. Bovi's statement that she invited other individuals

to attend the IEP process but that said individuals did not appear.

Ms. Bovi testified that Dr. Cushna had deferred giving his approval of the IEP so that she could present him with her purported alternative placement proposal, in writing. Ms. Bovi acknowledged that she did not thereafter provide Dr. Cushna with such written placement proposal.

Ms. Bovi stated that she forwarded to Kevin's parents a written description of a community-based program option before the November 3 settlement conference. She said there were two proposals in response to Dr. Cushna: one did not involve the Carroll Center, and the other one, set forth in a memo prepared by Ms. Bovi entitled "Program Proposal for Settlement Negotiations, Kevin W. Murphy, 1993–1994 School Year," Plaintiff's Exhibit 30, called for a 16–week training program at the Carroll Center, followed by the provision of services by Southeastern Regional Educational Service Center (SURESC).

Ms. Bovi testified that SURESC is an agency set up about 18 years ago to assist school districts in providing special education services. She stated that SURESC had been helpful with Kevin's placement in the Pinkerton program.

Ms. Bovi testified that she had communicated with SURESC, but that there was no teacher available.

At the August 23 meeting, Mr. Driscoll, Ms. Bovi, and Mr. Murphy engaged in the following exchange.

MR. DRISCOLL: ... is your school district making any kind of a statement as to what they will do if we—if we come up with an IEP next week? What would they do with it? Could we get an answer from them? Is the answer that [we'll] simply delay it until the appeal is done? Then there is [ ] no reason for you to feel uncomfortable.

MS. BOVI: But I am the school district. Okay.

MR. DRISCOLL: Yeah. Okay.

MR. MURPHY: So what are you going to do?

MS. BOVI: More than likely there will be delay. My thought is that if we can at least have a plan in place that can be implemented at [a] moment's notice, we can move forward. I mean, that's—

MR. MURPHY: Well, the entire team hasn't even met yet.

MS. BOVI: I know.

Plaintiff's Exhibit 15, at 75–76.

The court finds less than credible Ms. Bovi's testimony that when she stated at the August 23 meeting, "More than likely there will be delay," she did not know that for a fact.

Ms. Bovi acknowledged her agreement with Mr. Driscoll's view that the longer Kevin remained without a program, the more he would regress. She further acknowledged that she agreed with the statements concerning Kevin's regression set forth in the IEP. She stated that at the August 23 meeting the team agreed that the IEP would be based on the Perkins School for the Blind evaluation (Plaintiff's Exhibit 1) and Dr. Cushna's evaluations (Plaintiff's Exhibit 2).

Ms. Bovi testified that Kevin's placement was discussed during the period from October 29 to November 3, and that all of the other team members agreed that Kevin should be placed in the Conklin Center.

The court finds less than credible Ms. Bovi's testimony that she did not consider the Conklin Center to be a school, but rather a rehabilitation agency. She stated that Kevin's parents brought him to the Conklin Center for evaluation. She acknowledged that the staff there found it to be an appropriate placement for Kevin and recommended a residential placement. Ms. Bovi stated that she had seen the January 3, 1994, Conklin Center evaluation of Kevin. Plaintiff's Exhibit 8.

Ms. Bovi testified that she visited the Conklin Center on October 7, 1993, and met there with Robert Kelly. The court finds less than credible Ms. Bovi's statement that she didn't see much group activity, but saw mostly tutoring. Ms. Bovi testified that she found the Conklin Center to have a "fine program." She stated that she wanted the staff there to consult with her to design a

512

home program for Kevin so he could remain in his home community. She stated that the Conklin Center is not licensed by the Department of Education because it is not an educational facility.

The court finds less than credible Ms. Bovi's testimony that her concerns regarding the Conklin Center involved the issues of distance, the restrictiveness of the environment, and the transfer of skills back to New Hampshire. Further, the court finds less than credible Ms. Bovi's testimony that she was concerned over the issue of segregating Kevin such that he would be placed only with other disabled non-sighted individuals.

The court finds less than credible Ms. Bovi's testimony that the Conklin Center program is not an educational program and that she feels it is wrong to remove Kevin from his home community.

The court finds less than credible Ms. Bovi's assessment of the Conklin School as the most restrictive or the continuum of special education placements. The court finds less than credible Ms. Bovi's characterization of the Conklin Center as "an institution."

The court finds less than credible Ms. Bovi's testimony that she was concerned about Kevin's transition from the Conklin Center/Florida after the end of the compensatory education period.

The court finds less than credible Ms. Bovi's testimony that she was trying to compromise with the Murphys.

The court finds less than credible Ms. Bovi's testimony that she was trying to develop a program for Kevin comprised of a placement at the Carroll Center as part of such program, with the remainder of the program being individually designed. She stated that, as to such program, she had not gotten to the point of defining the remaining services and, as of the date of her testimony, had still not identified a teacher for such program. She stated that she knew some service providers for such program.

The court finds less than credible Ms. Bovi's testimony that the School District was offering a program that was not in place but could meet the IEP requirements.

At the September 24 meeting, the following discussion took place.

MR. MURPHY: We are back on the record. I would like to get on the record that five members of this team have expressed the opinion, an appropriate educational program for Kevin will be a residential program. And is—Frank, is that correct? Is that your opinion?

MR. DRISCOLL: That's my opinion.

MR. MURPHY: Dr. Cushna, is that your opinion?

DR. CUSHNA: Right, that's my opinion.

. . . .

MR. MURPHY: And that's my opinion. Colleen, is that your opinion?

MS. BOVI: My opinion is that Kevin's IEP needs to be implemented in an environment that is more than a typical school day.

MR. MURPHY: Okay.

MR. DRISCOLL: It's a step.

Plaintiff's Exhibit 16, at 47–48. Further, at the same meeting, Mr. Murphy, Ms. Bovi, and Mr. Driscoll discussed Mr. Murphy's suggestion that an evaluation of Kevin be done by the Conklin Center.

MS. BOVI: I don't know that we need to do an assessment right now. We have—I thought our team had agreed that we had the Perkins Evaluation, and that we were going to use that as a basis for developing his goals and objectives. The Perkins Evaluation I believe recommends—it states, residential placement. I don't think that you need to have any documentation or evaluation that would indicate—

MR. MURPHY: I take your point. That's a good point.

MS. BOVI: Why put Kevin through that?

MR. MURPHY: That's a good point.

MR. DRISCOLL: I agree with that.

Plaintiff's Exhibit 16, at 50–51.

The court finds less than credible Ms. Bovi's testimony that in her opinion Kevin did not need a residential placement because he had never been in one and because a

residential placement is not the least restrictive environment.

The court finds less than credible Ms. Bovi's testimony that she did not sign the IEP because she didn't agree with the residential component or the length of the school day based on her assessment of Kevin's educational need.

The court finds less than credible Ms. Bovi's testimony that she proposed the Carroll Center as a compromise. She stated that she did not feel that the Carroll Center was the best option.

At the October 29 meeting, Ms. Bovi, Mrs. Murphy, and Mr. Murphy stated,

MS. BOVI: Well, you know, I think, I'm kind of in a Catch–22 situation here and I'd like to just state this for the record. I was not able to do a whole lot of specifics with regard to placement unless I had parent consent. I did not have parent consent to gather information or share information with any placement relative to Kevin's needs.

We also did not have a finalized IEP, so how can I ask a placement to review an IEP to see if they could implement it. What I have done, and I feel that I have been within my bounds to do so, is to investigate and to talk with individuals who do provide services to adults with disabilities similar to Kevin's and looking at what services are available—what services are available for adults with disabilities, adults who are blind, visually impaired with multiple handicaps. And the [Carroll] Center for the Blind does provide services for adults. They are willing—I talked to them, because they said their program was a 16–week program. I said, is there any room for any change in that length of time, and the response I got was, yes, depending on what the needs were. If we have an IEP that has very specific needs implemented, I think addressed, and the team agrees with, then it's incumbent upon the placement to be able to follow through on that. So that's the information I could share. I am willing to set up additional meetings at the [Carroll] Center if anyone on this team would like to have any additional information. We can't move for-

ward—I could not move forward on any more specifics without your consent. So that's all I wanted to say. I will have—

MRS. MURPHY: But you didn't try to get our consent.

MS. BOVI: It wasn't appropriate at the time because we hadn't finished the IEP.

MRS. MURPHY: We still haven't finished the IEP because you won't sign it.

Plaintiff's Exhibit 17, at 52–54.

Ms. Bovi testified that Defendant's Exhibit P shows the estimated cost of defendant's proposed individualized community-based program, which is stated as $70,222. She further testified that Defendant's Exhibit O shows the cost of the Conklin Center placement to be $144,258. The court finds less than credible Ms. Bovi's testimony that the cost was not the only reason for rejecting the Conklin Center placement. She testified that she did look at cost and that the community-based program was "not cheap either."

The court finds less than credible Ms. Bovi's testimony that she did not sign the IEP because she did not agree with it, that she makes the decisions as to where Kevin is placed, and that no one in the district directed her.

Ms. Bovi testified that the delay between the August 23 and September 24 meetings was caused by Mr. Driscoll's being out of town, by the Murphys' being away for a couple of weeks, and because Kevin C. Murphy said he would be preoccupied with the matter of the First Circuit's consideration of defendant's appeal of this court's May 10, 1993, order. The court finds less than credible Ms. Bovi's testimony that she felt awful about the delay.

Ms. Bovi testified that Defendant's Exhibit E is a fax transmission from Kevin C. Murphy to her dated September 23, 1993, in which Mr. Murphy discusses the First Circuit's mediation of the case. She characterized the fax as Mr. Murphy's questioning spending time on the September 24 meeting. The fax states in part,

As of this hour, we have not seen any details of Timberlane's offer. We are unable to formulate cogent concerns or ques-

tions to bring before the IEP Team. We hesitate to ask the members of the IEP team to expend their valuable time or to apply their hard-earned wisdom to the speculations Jan and I now possess of what may or may not be forthcoming.

We deeply appreciate the effort you've put forth on Kevin's behalf, cognizant of the overwhelming demands the start of this school year have placed upon you. Yet, less than twenty three hours after you receive this, we will meet with Kevin's IEP team. Given the tight schedules of the members and the distances involved, we doubt that we will be given a second opportunity before we are required to meet with [Senior District] Judge [Walter Jay] Skinner [U.S. District Court for the District of Massachusetts] in Boston. Your missive of 21 September promises these details. If it is ready, or can be made ready in the few remaining hours, Jan and I would most appreciate an opportunity to study it and discuss it privately before presenting ourselves and our concerns tomorrow. I will remain "at the ready" to come to your office this day and retrieve the documents.

Ms. Bovi identified Defendant's Exhibit F, a fax transmission she sent to Mr. and Mrs. Murphy dated September 23, 1993, as her response to Mr. Murphy's fax transmission of the same date. Exhibit F states:

This acknowledges receipt of the urgent fax you sent to me this morning regarding our September 24 meeting.

As we discussed on the telephone the other evening, it is imperative that we move forward on the development of Kevin's IEP as ordered by Judge Devine in his U.S. District Court decision. Judge Skinner's order is for us to investigate settlement options which are separate from the first order. These two orders work in parallel with each other.

The details which were discussed at the settlement conference have not been finalized as yet. I am awaiting additional information to complete a proposal which will be shared with you. Our agenda for tomorrow's meeting is not dependent on settlement options.

I will work with you and the other team members to discuss options prior to the next settlement conference scheduled for October 13.

Ms. Bovi testified that she had met Margaret Cleary at the Carroll Center and had arranged a November 22 appointment for a intake interview for Kevin. She stated that Kevin did not go to the interview. She stated that Mr. Murphy disagreed with the Carroll Center as an option. She stated that Kevin and his father went to the Carroll Center in February after Kevin had already been accepted at the Conklin Center.

The court finds less than credible Ms. Bovi's testimony that she did not offer a different IEP because she is a strong believer in teamwork. She stated that one reason she did not offer a different IEP was because she agreed with the majority of the IEP.

The court finds less than credible Ms. Bovi's testimony that the parts of the IEP which she agreed with could be implemented in defendant's purported proposal.

*Cynthia Maher*

The court finds credible the testimony of Cynthia Maher, who appeared under a subpoena procured by defendant.

Ms. Maher testified that she has been employed by Region 10 for nine years. She stated that Region 10 provides a variety of services for an area which includes Plaistow.

She testified that she initiated a telephone conversation with Kevin C. Murphy in early December 1993, which she characterized as a routine call made because Mr. Murphy's son was on Region 10's waiting list for services. She stated that Mr. Murphy did not feel it was necessary to get Region 10 involved at that time.

Ms. Maher testified that she brought the documents labeled as Defendant's Exhibits Q and R in response to a subpoena. Defendant's Exhibit Q is an application for Region 10 services in the name of Kevin W. Murphy dated December 29, 1989. The second page of said document indicates that the following services were requested: case management, transportation, evaluation, family support, respite care, and "Elementary Education:

Full–Time/Geared to blind/Training i.e. Reading Writing & Arithmetic in a classroom with others learning at same rate and Level (approximate)."

Ms. Maher stated that Region 10 has never provided elementary education. She stated that the Murphys used respite services on one occasion in 1990.

She testified that during their December 1993 telephone conversation, Mr. Murphy did not say that he did not want her to attend an IEP meeting. She stated that if she had received a request she would have called Mr. Murphy and asked him if he wanted her to attend.

Ms. Maher identified Defendant's Exhibit R as a 1990 letter to Mr. Murphy informing him that he was on the waiting list. She testified that there is no further record of correspondence in the Region 10 file.

Plaintiff's Exhibit 34 contains two documents, the first being a letter from Dennis Powers, Executive Director of Region 10, dated September 6, 1991, stating:

To Whom it May Concern,

This letter is to document the fact that Kevin W. Murphy of 97 Forest Street, Plaistow, NH is currently on the waiting list for services from Region 10 Community Support Services, Inc.

Kevin's father, Kevin C. Murphy first applied for services on December 29, 1989 and Kevin was found to be eligible for services on February 8, 1990. He subsequently applied for Respite services on April 10, 1990.

Unfortunately due to a lack of resources, Kevin was placed on a waiting list for services where he remains today.

During this period of time Mr. Murphy has remained in contact with Region 10 and is periodically updated on Kevin's status.

If in the future, additional funding is available, Kevin will begin receiving services from Region 10.

The second document of Exhibit 34 is a letter from Cynthia Maher to Kevin C. Murphy dated December 9, 1993, stating,

I wanted to confirm our phone conversation on December 7, 1993 regarding your son, Kevin.

I know that there are many issues pending with your son's status with his educational services. It is also my understanding (based on our phone conversation) that you are unsure of how long it will be before all of these issues have been resolved and your son receives his compensatory education. Based on this, it is very difficult to predict when we will need to be involved and begin to plan for that period. You son will remain on our waiting list for the services requested.

The waiting list in New Hampshire is based on priority of need, with the first priority being those "Individuals who are at imminent risk of substantial harm or significant regression in developmental functioning due to lack of food, clothing, shelter or inadequate supervision". Since I do not know when your son will be in need of assistance, it is difficult to justify a priority I status. Priority I status is for those individuals who are in immediate need of assistance, and for whom where is no other funding source.

It is also important to note that our current services do not offer an academic component. We focus on teaching individuals life skills which maximize the person[']s independence in functional skill areas, (i[.]e. vocational, activities of daily living, community/social participation, etc.). These are the skills individuals will need to participate and live in their communities.

I hope that we can stay in contact with each other. I would be glad to meet with you to begin planning for Kevin's future at a time you feel would be prudent.

It was a pleasure talking with you. Please feel free to contact me if I can be of any further assistance.

Ms. Maher testified that Region 10 does not have any more resources than it did in 1991 to pay for services for Kevin. She stated Region 10 has never provided education services and would look to educators to provide education.

Ms. Maher stated that until the state allocates monies there is no right to its services.

*Jo–Ann Sowers, Ph.D.*[9]

The parties stipulated as to the testimony of Jo–Ann Sowers, an expert in the area of multihandicapped persons and transition services from school to adult life. She is not an expert regarding persons with vision impairments. Further, Dr. Sowers has never met Kevin W. Murphy or any member or the Murphy family. She attended none of the team meetings. She has never spoken to Dr. Cushna or to Frank Driscoll. She has never visited or seen the Conklin Center, and has not reviewed the transcripts of the team meetings.

Dr. Sowers reviewed the Perkins School for the Blind evaluation (Plaintiff's Exhibit 1), the IEP and Placement (Plaintiff's Exhibit 13), the Conklin Center report (Plaintiff's Exhibit 8), the Conklin Center brochure (Defendant's Exhibit L), and the individualized community-based program as proposed by defendant (Defendant's Exhibit I).

In her opinion, the IEP (without the residential component) is appropriate for Kevin and can be implemented in the community-based program represented in Defendant's Exhibit I, which she believes to be the least restrictive environment for Kevin.

In her opinion, based on her research and experience, a person with disabilities should be placed in the community, not in an institution. She believes the Conklin Center is an institution, and is the most restrictive placement in the continuum of placements.

She believes New Hampshire is a progressive state as to community-based programs, and believes that is why no Conklin Center exists in New Hampshire. The parties stipulated she would testify that community-based programs, including programs like the one set forth in Defendant's Exhibit I, are being implemented all over New Hampshire. She believes these programs, which are not tied to any place, are the best practices for individuals with disabilities.

The parties stipulated that Dr. Sowers would testify that her experience tells her that even severely handicapped individuals do not need to be with other similarly handicapped individuals. However, she believes

Kevin's disability is mild, and therefore he does not need to be with other similarly handicapped individuals.

She believes the Conklin Center is not an acceptable placement and believes that under no circumstances should a program like the Conklin Center be considered for Kevin.

She believes that developing transition plans with appropriate adult services agencies in the community is integral to the success of any program. She believes transition needs to begin early to ensure transfer and generalization of skills.

*3. Kevin W. Murphy's Compensatory Education Program/Placement Pursuant to May 10, 1993, Order*

In *Pihl v. Massachusetts Dept. of Educ.*, 9 F.3d 184 (1st Cir.1993), the First Circuit held "that compensatory education is available to remedy past deprivations," stating, "If an IEP from a past year is found to be deficient, the [IDEA] may require services at a future time to compensate for what was lost." *Id.* at 189. Further, the First Circuit noted, "In awarding compensatory education past the age of entitlement, courts have directed the parties to take into account the student's educational status and needs at the time the relief takes effect." *Id.* at 188 n. 8.

*Findings Regarding Program/Placement*

■ In light of the above, and considering all of the evidence, the court finds:

1. Timberlane Regional School District has not presented this court with a specific alternative compensatory education program/placement to the IEP contained in Plaintiff's Exhibit 13/Conklin Center placement.

2. The IEP contained in Plaintiff's Exhibit 13/Conklin Center placement is an appropriate compensatory education program/placement under the IDEA.

Accordingly,

1. Defendant shall, commencing within 30 days of this order, provide Kevin W. Murphy with one year of compensatory education ser-

---

**9.** Jo–Ann Sowers has a Ph.D. in Special Education and Rehabilitation.

vices at the Conklin Center program in accordance with the program set forth in the IEP. At plaintiff's request, the court will consider imposing criminal contempt sanctions against any individual and/or entity responsible for a failure of the defendant to comply with this order.

2. Absent a contrary order of this court, defendant shall, pursuant to the May 10, 1993, order, provide Kevin with his second consecutive year of compensatory education services in the Conklin Center in accordance with the program set forth in the IEP. However, nine months after the date of Kevin's initial placement at the Conklin Center pursuant to this order, Dr. Cushna [10] and the Conklin Center shall each complete, at defendant's expense, a report containing (1) an evaluation of Kevin's progress at the Conklin Center and (2) recommendations as to Kevin's program and placement for the second year of compensatory education. Said reports shall be submitted to the individual members of the team, whereupon the team shall convene for the purpose of reformulating the IEP and/or placement.[11] The parties shall notify the court as to the team's conclusions no later than 10 months after the date of Kevin's initial placement at the Conklin Center pursuant to this order. Should the team fail to reach agreement, either party may petition the court for modification of Kevin's program and/or placement.

### 4. The Request for Civil Contempt Sanctions

■ "[A] complainant must prove civil contempt by clear and convincing evidence." *Langton v. Johnson*, 928 F.2d 1206, 1220 (1st Cir.1991). "To be enforceable in contempt an injunctive decree must satisfy the specificity requirements of Fed.R.Civ.P. 65(d)." [12]

*Burke v. Guiney*, 700 F.2d 767, 769 (1st Cir.1983). Further, "substantial compliance can avert a finding of contempt," *Langton, supra*, 928 F.2d at 1220; that is, " '[a] court may hold a party in civil contempt only if . . . "the defendant has not been reasonably diligent and energetic in attempting to accomplish what was ordered." ' " *Id.* (quoting *Drywall Tapers, Local 1974 v. Local 530*, 889 F.2d 389, 394 (2d Cir.1989) (further citation omitted), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990)).

Civil contempt sanctions can include "a conditional fine to *induce* the purging of contemptuous conduct . . . [and] a *compensatory* fine to make whole the aggrieved party for damages caused by the contemnor's conduct." *In re Kave*, 760 F.2d 343, 351 (1st Cir.1985) (emphasis in original).

### Findings Regarding Civil Contempt

In light of the above, and based on all the evidence, the court finds that the evidence before it provides clear and convincing proof that:

1. Mr. and Mrs. Murphy participated in the IEP/Placement process set forth in this court's order of May 10, 1993, in good faith.

2. Timberlane Regional School District, intentionally and in bad faith, prevented the IEP team from reaching a consensus on Kevin's program and placement.

3. Timberlane Regional School District never presented to either the IEP team or this court a specific alternative compensatory education program/placement to the IEP contained in Plaintiff's Exhibit 13/Conklin Center placement.

4. By preventing the IEP team from reaching a consensus on Kevin's program and placement, and by failing to present a

---

**10.** In the event that a member of the team becomes unavailable, the parties shall each submit to the court one name as a proposed replacement, whereupon the court shall determine such replacement.

**11.** This may be accomplished in a single meeting.

**12.** Rule 65(d) provides,
> Every order granting an injunction and every retraining order shall set forth the reasons

for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

specific alternative compensatory education program/placement, Timberlane Regional School District has, since January 3, 1994,[13] delayed Kevin's placement, and continues to do so.

Further, based on all the evidence, the court finds that:

1. Kevin has been and continues to be harmed by each day he is deprived of the compensatory education services to which he is entitled under the May 10, 1993, order.

2. For each day Kevin is deprived of compensatory education services to which he is entitled, he requires an additional day of education services to make him whole.

The court finds that Timberlane Regional School District is in contempt of the May 10, 1993, order.

Accordingly, immediately following its provision of the two years of compensatory education services required by the May 10, 1993, order, defendant shall provide Kevin with an additional period of education services for a period of time equal to the period from January 3, 1994, to the date of Kevin's initial placement at the Conklin Center pursuant to this order.

Absent a contrary order of this court, defendant shall provide Kevin with said additional period of education services as a continuation of the program and placement in effect upon the completion of Kevin's second year of compensatory education, subject to the same review procedures set forth above to determine Kevin's placement and program for his second year of compensatory education services.

### Conclusion

For the reasons stated herein, the court grants plaintiff's motion to enforce judgment (document 90) and orders the relief stated herein.

SO ORDERED.

---

13. The court notes that this is the date Kevin was approved by the Conklin Center for participation in its program.